**BOB JONES UNIVERSITY, Plaintiff,**

v.

**John B. CONNALLY, Secretary of the Treasury of the United States, and Johnnie M. Walters, Commissioner of Internal Revenue, Defendants.**

**Civ. A. No. 71–891.**

United States District Court,
D. South Carolina,
Greenville Division.

Nov. 17, 1971.

J. D. Todd, Jr., Wesley M. Walker, O. Jack Taylor, Jr., Greenville, S. C., for plaintiff.

John K. Grisso, U. S. Atty., Greenville, S. C., Stanley F. Krysa, Atty., U. S. Justice Dept., for defendants.

## ORDER

SIMONS, District Judge.

This matter is before the court upon plaintiff's Complaint seeking an injunction *pendente lite*, and upon defendant's Motion to Dismiss plaintiff's Complaint for lack of jurisdiction.

The court received briefs and heard arguments on October 4, 1971, with regard to both the Motions. From the Complaint, affidavits and supporting documents, and the deposition of William H. Connett, Assistant to the Commissioner of Internal Revenue, and from a study of statutory provisions, rules and regulations and authorities involved, the court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Bob Jones University is an eleemosynary corporation, organized and granted its certificate of incorporation on November 20, 1952. The University's predecessor was known as Bob Jones College, which was founded near Panama City, Florida, in 1926. The plaintiff was originally founded and has continued to exist as a fundamentalistic, religious organization which has chosen the field of education, principally at the college level, as the vehicle through which to teach and promulgate its fundamentalistic religious beliefs. The creed of the college as originally founded and the purpose clause of its charter is as follows:

> The general nature and object of the corporation shall be to conduct an institution of learning for the general education of youth in the essentials of culture and in the arts and sciences, giving special emphasis to the Christian religion and the ethics revealed in the Holy Scriptures; combatting all atheistic, agnostic, pagan, and so-called scientific adulterations of the Gospel; unqualifiedly affirming and

teaching the inspiration of the Bible (both the Old and the New Testaments); the creation of man by the direct act of God; the incarnation and virgin birth of our Lord and Savior, Jesus Christ; His identification as the Son of God; His vicarious atonement for the sins of mankind by the shedding of His blood on the cross; the resurrection of His body from the tomb; His power to save men from sin; the new birth through the regeneration by the Holy Spirit; and the gift of eternal life by the grace of God.[1]

2. It further appears from the affidavit of Dr. Bob Jones, III, President of the University, as well as from the affidavits of Dr. Bob Jones, Jr., Chairman of the Board, and Dr. R. K. Johnson, Secretary-Treasurer and Business Manager, that the University's fundamentalistic religious beliefs and practices include the belief and principle that God intended that the various races of men should live separate and apart, and that the inter-marriage of different races is contrary to the will of God, and to the teachings of the Holy Scriptures. In keeping with this religious belief and principle, the University has adopted an admissions policy prohibiting the admission of black students to the University.[2] The plaintiff has also adopted a rule prohibiting its students from dating or marrying members of another race, whether students or not. Violation of this rule results in expulsion from the University. The University believes it would be impossible to enforce that rule if the University were to adopt a racially nondiscriminatory admissions policy (affidavit of Dr. Bob Jones, III). The University requires all students to attend daily chapel services at which the religious views and principles of the University are taught, and all classes and meetings held under the University sponsorship are begun and ended with prayer. All students, with inconsequential exceptions, are required to take courses in religion each semester. All faculty members are required to teach and adhere to the religious beliefs and principles of the school, and any member of the faculty or member of the student body teaching or promoting religious beliefs contrary to those of the University is subject to dismissal. The admissions standards of the University relate not only to academic achievement but also to the religious convictions of a given applicant as well. The University does not now accept, and has not in the past accepted, federal or state grants in aid, nor does it participate in any programs financed by the federal or state governments because the University apparently understands that if it did so it would be required to adopt a racially nondiscriminatory admissions policy which would be contrary to its religious beliefs and practices.

3. The University has apparently enjoyed tax exempt status since its formation, although the records of the University do not go back that far in this regard. The record contains a letter dated March 30, 1951,[3] received by the University from the then Deputy Commissioner, advising that it qualified as a tax exempt organization, which also referred to a similar ruling of April 30, 1942. The record substantiates that there has been no significant change in the University's practices, principles, or policies since that date.

4. News releases of the Internal Revenue Service issued on July 10 and July 19, 1970, constituted the first threat to the University's tax exempt status. Thereafter the University received a letter of inquiry from the District Director of Internal Revenue requesting information concerning the admissions policies of the University with regard to race.

---

1. See Page 2 of the affidavit of Dr. Bob Jones, III, and certified copy of certificate of incorporation attached thereto.

2. One married black part-time student has recently been admitted to the University.

3. Copy of letter attached to the affidavit of Dr. R. K. Johnson, Secretary-Treasurer and Business Manager of the University.

A copy of that letter is attached to the affidavit of Dr. Bob Jones, III. The University's reply was in the form of a letter dated December 30, 1970, which is attached to the affidavit of Mr. William H. Connett. During 1971 various conferences and discussions were held between officials of the Internal Revenue Service, including former Commissioner Randolph W. Thrower, and the present Commissioner, Johnnie M. Walters, and attorneys for the plaintiff. These discussions culminated on or about September 8, 1971, when counsel for the plaintiff concluded that a clear threat existed that the University's status as a tax exempt organization was about to be revoked, and that the advance assurance of deductibility of contributions previously given by the Internal Revenue Service to its contributors was about to be withdrawn.

5. The following day, September 9, 1971, the plaintiff instituted this action, alleging that this threatened action would inflict irreparable harm upon the University, that such threatened action was unlawful in that it exceeded the authority vested in the defendants by Congress, was contrary to the provisions of § 501(c) (3) of the Internal Revenue Code, and would be in violation of the First and Fifth Amendments to the Constitution of the United States. Plaintiff, accordingly, requested temporary and permanent injunctive relief from this court.

6. One of the grounds urged by defendants in support of their Motion to Dismiss is that plaintiff has not exhausted the administrative remedies available to it under Revenue Procedures 68–17 and 69–3. Mr. Connett's affidavit sets forth the administrative procedures which would be employed were this court not to grant injunctive relief. However, from his affidavit and deposition it appears that there remains very little doubt as to the ultimate loss of plaintiff's tax exempt status. In his deposition Mr. Connett states that plaintiff's tax exempt status would be revoked under the existing law, unless the plaintiff chose to change its admissions policy to comply with the requirements of the IRS and admit black students on a nondiscriminatory basis.[4] It is thus concluded that any attempt by the plaintiff to follow these administrative procedures would most probably be a useless act, inasmuch as the decision to revoke the tax exempt status of any organization not willing to adopt a racially nondiscriminatory admissions policy apparently has already been made by the Washington Office of the Internal Revenue Service.

A review of the procedures outlined in Mr. Connett's affidavit indicates that by subjecting itself to these procedures the plaintiff would likely suffer irreparable damage. Mr. Connett reveals a sequential process by which, first, advanced assurance of deductibility of contributions would be withdrawn, and second, the University would be denied tax exempt status and then taxes assessed and collected. Undoubtedly a period of many

---

4. Numerous news releases with a Washington dateline have been noted recently in which it is indicated that many private schools in this and other states have been noticed by the IRS that they will lose their tax exempt status unless they certify that they have adopted a racial nondiscriminatory admissions policy.

Furthermore, plaintiff submitted the affidavit of Mr. Joe N. Cocke, who states that the IRS withdrew its prior assurance of deductibility of contributions made to Fayette Academy, and thereafter revoked the Academy's tax exempt status. Attached to his affidavit is a letter dated January 12, 1971, signed by the District Director of the Internal Revenue Service, Atlanta, Georgia. The District Director referred to a previous letter dated December 3, 1970, notifying the Academy of the suspension of advance assurance of deductibility of contributions to that organization pending final determination of its status. The letter goes on in Paragraph 3 to advise the academy of its right to protest and its right to have conferences at both the District and National Office levels. The fourth paragraph of that letter states: "A conference at either the District or National Office would probably serve no useful purpose if you have no intention of adopting a racially nondiscriminatory admissions policy. . . . "

months would elapse between the time that advanced assurance of deductibility of contributions would be withdrawn and a tax finally assessed and collected, thus requiring redress in the courts pursuant to 26 U.S.C.A. § 6213; 28 U.S.C.A. §§ 1346(a) (1), 1491; 26 U.S.C.A. §§ 6532, 7452. It is to be expected that while the Internal Revenue Service is conducting administrative conferences leading to the assessment and collection of a tax, the plaintiff's contributions, upon which it relies heavily, would be curtailed, if not eliminated altogether. Under these circumstances these administrative procedures would serve no useful purpose.

■ The plaintiff would likely suffer irreparable harm if the threatened action is not enjoined. Plaintiff submitted, in addition to the affidavits previously referred to, the affidavit of another of its counsel, O. Jack Taylor, Jr.; John E. Fowler, C.P.A., employed by the University for the past twenty-five years or more; Jo Ann Hatcher, donations secretary to the University; and affidavits from ten of its contributors. The force and effect of these affidavits is as one might expect: the financial lifeblood of the University to a substantial extent is dependent upon contributions made to it. It appears that cash donations are received daily. During the twenty-day period from September 1 through September 20, 1971, the University received individual cash gifts totaling $29,695.83. The cash contributions for the year, from August 30, 1970 to August 28, 1971 exceeded $500,000. Attorney Taylor's affidavit attaches correspondence passing between him and counsel for the Nationwide Foundation in the early part of 1971, to the effect that the Nationwide Foundation, which formerly had made matching grants to the University, would because of the threatened action, no longer continue their program of matching grants. Affidavits from the ten individual contributors stated that their donations to the University materially depended upon their assurance that the same would be deductible on their individual income tax returns, and that should the Internal Revenue Service withdraw such assurance of deductibility, their respective contributions would be severely curtailed. The affidavits of the officials of the school substantiate the conclusion that should this financial assistance be curtailed, the University's existence would be jeopardized; and that in an effort to make up for its loss of income received through contributions and to replace the moneys expended in attempting to attain a taxpaying status from a records standpoint (estimated by the accountant Fowler to be between $80,000 and $100,000), the University would be forced to revise upward its fees and tuition, with the attendant disruption in the educational programs of its students, and the curtailment of future applications caused by such increases. In addition, the University has a funded indebtedness, as well as an expansion program, which would be placed in jeopardy, and members of its faculty and staff would undoubtedly suffer through the possible loss of current income and retirement programs.

The defendants contend that no irreparable harm would result to the University because of the fact that it could compute and pay its tax and seek refund or otherwise contest the same in either the district court or the tax court. As previously indicated, however, the real harm—the loss of contributions and its attendant consequences—would already have transpired and could not realistically be remedied by this process.

7. The statutory provisions under which plaintiff previously has been granted tax exemption, § 501(c) (3), of the Internal Revenue Code of 1954, provide exemption from taxation for:

Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the

benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and the subject matter of this action. 28 U.S.C. § 1331 et seq.

 As previously indicated, the court has concluded that this action is not premature because of a failure, on plaintiff's part, to exhaust available administrative remedies. Further, the court concludes that it is not barred from entertaining jurisdiction of the within action because of defendant's other objections thereto. Defendants contend that plaintiff's action seeks an injunction to avoid the assessment and collection of taxes and is barred by the anti-injunction statute, § 7421(a), and cannot be the subject of a declaratory judgment proceeding, since 28 U.S.C. § 2201 permits such actions except those "with respect to federal taxes"; and, that it is also barred by the principle of sovereign immunity.

Up until now there has been no assessment or even an attempt at assessment of any tax insofar as Bob Jones University is concerned. The defendants admit that assessment procedures would not be commenced until the administrative procedures which they contend are available to the plaintiff have been exhausted; and that no tax would be due if plaintiff's exempt status were then revoked until some time in the calendar year 1972. Technically this suit does not involve an attempt to enjoin the assessment and collection of a tax. Recognizing this, the defendants argue that the word "assessment" includes all acts that are necessarily prerequisite to the actual act of making the assessment, and rely upon Calkins v.

Smietanka, 7 Cir., 240 F. 138 (1917); Campbell v. Guetersloh, 287 F.2d 878 (5 Cir. 1961); Wahpeton Professional Services, P. C. v. Kniskern, 275 F.Supp. 806 (D.C.N.D.1967); Koin v. Coyle, 402 F.2d 468 (7 Cir. 1968); Chester v. Ross, 231 F.Supp. 23 (N.D.Ga.1964), aff'd. 351 F.2d 949 (5 Cir. 1965); Cooper Agency, Inc. v. McLeod, 235 F.Supp. 276 (D.C.S.C.1964). In each of these cases, an attempt was made to enjoin an action on the part of the Internal Revenue Service directly involved with either the assessment or collection of a tax. In *Calkins* the injunction sought to prevent the production of records during an audit. In *Campbell* the injunction sought to prevent the Service from determining tax due based upon the "bank deposits" method of reconstruction of income. In *Wahpeton*, the action was brought under the declaratory judgment act seeking a declaration as to whether the alleged taxpayer qualified as a corporation and trust for tax purposes. The *Koin* case involved the attempt to assess wagering taxes and involved evidentiary issues thereabout. And in *Chester* there was similarly involved an attempt to suppress the use of evidence because of an injunction procedure where a tax assessment was directly involved.

The court has considered those cases dismissing actions for want of jurisdiction where the question presented involve the tax exempt status of institutions. Jolles Foundation, Inc., v. Moysey, 250 F.2d 166 (2 Cir. 1957); Kyron Foundation, Inc. v. Dunlap, 110 F.Supp. 428 (D.D.C.1952). The court is convinced that the principles enunciated in those cases are not applicable nor controlling here. The plaintiff does not ask this court to substitute its judgment for that of a federal officer acting in his official capacity. The gravamen of plaintiff's Complaint is that the defendants are threatening to act outside of their authority to exercise judgment and discretion which are not within the legal limits of their authority in such circumstances, since they are purporting to act beyond the authority granted by the

constitution or by the Congress, and to read into the Internal Revenue Laws powers that are not expressly given and that were never intended by Congress.

If the question here were the applicability of the threatened action to the plaintiff rather than the validity of the action itself, the court would most probably be persuaded to take a different view. If there were no contest as to the legality or the power of the defendants to revoke under existing law plaintiff's tax exempt status because of its admitted racial discriminatory admissions policy, but was instead a case involving the applicability of such a rule to the plaintiff, it would then appear to be a case where this court was asked to preempt discretionary power of a federal officer which it would be powerless to do. However, the plaintiff readily concedes that it practices a racial discriminatory admissions policy, placing it squarely in violation of the avowed policy of defendants. Thus, this is not a case where the defendants or the court must decide the question of whether the University has a racially nondiscriminatory admissions policy. Plaintiff is not challenging the applicability of the rule, but the legality of the rule itself.

Bob Jones University is not seeking a declaratory judgment, but rather seeks to enjoin the defendants from exercising alleged illegal and *ultra vires* power and authority. Consequently, it is concluded that the levy, assessment, and collection of a tax is not the main issue. Plaintiff does not contest the amount or method of any levy, assessment, or collection, or evidence to be used in making such determination of taxes that might become due. Plaintiff is seeking to enjoin what it contends to be illegal and unconstitutional actions or threatened actions on the part of officials of the United States Government which it claims would lead to irreparable harm of plaintiff, the 4,500 students who attend the plaintiff University, some 650 faculty and staff members, and of the public which is served by the existence of the University.

The Supreme Court has decided many cases in which it has stated the obvious purpose for which the anti-injunction statute was enacted. In Enochs v. Williams Packing & Nav. Co., 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed. 292, the Court said:

The manifest purpose of § 7421(a) is to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund. In this manner the United States is assured of prompt collection of its lawful revenue.

The courts have consistently applied this statute in those cases which do not come within the exception thereto, and have refused to entertain jurisdiction of suits seeking injunctions against the levy, assessment, and collection of federal taxes. Many years after the adoption of the original anti-injunction statute, Congress enacted the declaratory judgment act which taxpayers were quick to utilize to avoid the effects of the anti-injunction act. Congress rightfully put an end to such suits by amending the declaratory judgment act by inserting the phrases "except with respect to Federal taxes," which removed the jurisdiction of federal courts to hear declaratory judgment proceedings with respect to the levying, assessment and collection of federal taxes.

Jurisdiction of suits of the nature of this case has been exercised by the courts for many years. For instance, see Hill v. Wallace, 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822 (1922) and cases cited therein. In *Hill*, plaintiff sought to enjoin the Commissioner of Internal Revenue from imposing a tax on contracts for the sale of grain for future delivery. The Commissioner moved, as he does in the matter before this court, to dismiss the suit, contending that the action was an attempt to enjoin the collection of a tax, contrary to a predecessor of § 7421(a) of the current Internal Revenue Code. The Supreme Court held that such was not the nature of the action

brought by the plaintiffs in *Hill*. In doing so, the Court said:

> It is impossible to escape the conviction, from a full reading of this law, that it was enacted for the purpose of regulating the conduct of business of Boards of Trade through supervision of the Secretary of Agriculture and the use of an administrative tribunal. . . . The manifest purpose of the tax is to compel Boards of Trade to comply with regulations, many of which can have no relevancy to the collection of a tax at all. . . . The act is in essence and on its face a complete regulation of Boards of Trade, with a penalty of 20 cents a bushel on all "futures" to coerce Boards of Trade and their members into compliance.

■ Likewise the record in this case supports the conclusion that the primary purpose of requiring Bob Jones University to adopt a racial nondiscriminatory admissions policy is not to levy, assess, and collect a tax from the plaintiff, but is being done solely for the purpose of complying with a recently espoused policy of the Internal Revenue Service to require certain private educational and religious institutions to adopt and administer racially nondiscriminatory admissions policies and practices. It is obvious that if the plaintiff will agree to the demands of the defendants and change its admissions policy so as to admit blacks on a nondiscriminatory basis, the tax exempt status held by the plaintiff with the express approval of the defendants for a period in excess of forty years will continue in full force and effect.

The conclusion is inescapable that the primary purpose of the defendants in threatening the revocation of the plaintiff's tax exempt status is not to assess and collect taxes, but to compel, through the use or threat to use, taxing powers to require private educational and religious institutions to comply with certain political or social guidelines with regard to the question of racial integration. As

such, the plaintiff's action should not be barred by 26 U.S.C. § 7421(a), or 28 U.S.C. § 2201. In finding that this case is barred neither by the anti-injunction statute nor provisions of the Declaratory Judgment Act, the court is mindful of the decision in DeMasters v. Arend, 313 F.2d 79 (9 Cir. 1963). In *DeMasters*, the taxpayer sought to restrain the Internal Revenue Service from investigating the possible income tax liability for years barred by the statute of limitations in the absence of fraud. There the court said:

> . . . If appellants were indeed prohibited by Section 7605(b) or the Fourth Amendment from initiating this inquiry, a suit to restrain their unlawful conduct would not be barred by the doctrine of sovereign immunity.

In a footnote the Court stated:

> We are also satisfied that this taxpayers' suit is neither one for declaratory judgment "with respect to federal taxes" precluded by 28 U.S.C.A. § 2201; nor an action "for the purpose of restraining the assessment or collection of any tax" precluded by 26 U.S.C.A. § 7421(a).

■■ The court also concludes that this action is not barred by the Doctrine of Sovereign Immunity. It has long been recognized that the sovereign cannot act illegally or unconstitutionally and, therefore, if an act or threatened action is unconstitutional or illegal it is not the action of the sovereign and such acts or threatened acts can be enjoined. Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882); Bivens v. Six Unknown Named Agents of Fed. Bur. of Narc., 409 F.2d 718 (2 Cir. 1969). Since the primary thrust of plaintiff's action is that it is seeking to enjoin a threatened illegal and unconstitutional act, it is concluded that the court is not deprived of jurisdiction because of the Doctrine of Sovereign Immunity.

Based on the foregoing the court concludes that defendants' Motion to Dismiss should be denied.

2. Plaintiff's Motion for an injunction *pendente lite* should be granted.

█ Based on the present record, the court finds that plaintiff has made a prima facie showing that the defendants have surpassed, or are in the process of exceeding, their statutory authority as granted to them by the Congress in the Internal Revenue Laws.

In this connection, the court is not unaware of the three-judge district court decision in Green v. Kennedy et al., 309 F.Supp. 1127 (1970). It is concluded that the *Green* case is distinguishable both on its facts and in the legal issues presented therein. In the first place, the plaintiff school here has practiced the admissions policy now in issue for over forty years, whereas, in the *Green* case, the private schools whose tax exempt status was being challenged were only recently established "as an alternative available to white students seeking to avoid desegregated public schools." Then, too, the present plaintiff contends, and has introduced substantial evidence in support of such proposition, that its admission policy is, and always has been, based on religious considerations.[5] The *Green* court was not confronted with such a substantial conflict between constitutional rights—that is, the right of religious organization to practice its teachings without being treated any differently than any other religious group by the United States government versus the right not to be discriminated against on the basis of race—when it reached its decision. In point of fact, the *Green* court not only was not faced with this issue, but also was without the benefit of the reasoning and holding contained in the more recent case of Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); the case plaintiff relies upon so heavily in support of its interpretation of the aforesaid constitutional right it advances. In the *Walz* case the Supreme Court held that "for the government to exercise at the very least this kind of benevolent neutrality, [tax exemption,] toward churches and religious exercises generally *so long as none was favored over others and none suffered interference*" was not a violation of the religious clauses of the First Amendment. In this context, and for the sole purpose of considering this request for temporary relief, this court concludes that the rationale and the holding of the *Green* case are not controlling herein.

Another reason why the court is disposed to grant plaintiff's Motion is that upon balancing the equities and weighing relative hardships that would be incurred by the respective parties if the relief asked for is granted or denied, it concludes that the equities lie in favor of granting the temporary injunction. In the event temporary injunctive relief is denied to the plaintiff, and should it prevail after a trial on the merits it could not, in all likelihood, recover the loss of contributions which it probably would experience because of the threat of loss of its tax-exempt status. On the other hand, should the defendants prevail in the trial they would not have incurred any substantial monetary expense, loss, or other irreparable harm, since any taxes that plaintiff might then be required to pay would not be due and owning until April 15, 1972, a date long after a decision on the merits should have been reached; and they would have been enjoined from revoking plaintiff's tax-exempt status only for a short period of time. Moreover, as the court previously observed, the revocation of plaintiff's tax-exempt status is not being attempted for the purpose of raising additional tax revenues, but for the purpose of compelling plaintiff to adopt a non-discriminatory admission policy. Whether or not the defendants will ultimately achieve this goal is not a question for this court to answer, but in

---

5. This is but one of several constitutional rights that plaintiff contends will be violated if its tax exempt status is revoked.

view of the aforesaid substantial clash of constitutional guaranties involved in this controversy this court does believe, and accordingly decides, that if in fact the outcome of this litigation will have any effect on the attainment of this goal such a result should come only after a trial on the merits has been had. It is, therefore,

Ordered that the defendants' Motion to Dismiss be, and it hereby is denied; and, it is further

Ordered that the defendants, their agents, servants, deputies, employees, successors in office and all persons in active concert with them, are hereby enjoined *pendente lite* from revoking or threatening to revoke the tax exempt status of plaintiff, and further enjoined *pendente lite* from withdrawing advanced assurance deductibility of contributions solely because of the admissions policy of plaintiff pending a final hearing and determination of this cause on the merits.