467 F.2d 1048
 4 ERC 1610, 2 Envtl. L. Rep. 20,586
 SIERRA CLUB and Citizens for Clean Air and Water,
Plaintiffs-Appellants and Cross-Appellees,
v.
Walter J. HICKEL, individually and as Secretary of the
Interior, et al., Defendants-Appellees and Cross-Appellants.
 Nos. 71-1940, 71-1941.
 United States Court of Appeals,
Sixth Circuit.
 Sept. 22, 1972.
 
 Michael T. Honohan, Cleveland, Ohio, for plaintiffs-appellant; Benesch, Friedlander, Mendelson & Coplan, Jerome S. Kalur, Jamison, Ulrich, Burkhalter & Hesser, Cleveland, Ohio, Bruce J. Terris, Washington, D. C., Donald W. Large, University of Wis. School of Law, Madison, Wis., on briefs.
 Carl Strass, Washington, D. C., and Wilson W. Snyder, Toledo, Ohio, for defendants-appellees; Shiro Kashiwa, Asst. Atty. Gen., Edmund B. Clark, Dept. of Justice, Washington, D. C., John Lansdale, Jr., George I. Meisel, Squire, Sanders & Dempsey, Cleveland, Ohio, Leslie Henry, Fuller, Henry, Hodge & Snyder, Toledo, Ohio, on brief.
 Before WEICK and McCREE, Circuit Judges, and FEIKENS,* District Judge.
 WEICK, Circuit Judge.
 
 
 1
 Sierra Club and Citizens for Clean Air and Water filed their complaint in the District Court for declaratory judgment, restraining order and equitable relief in which they sought to nullify a completed exchange of lands between the Secretary of Interior and two public utility companies (Toledo Edison Company and Cleveland Electric Illuminating Co., C.E.I.), made two years previously, claiming that the exchange agreement was improper and unauthorized and in derogation of the Secretary's statutory duties and void. They further sought to enjoin the Director of the Atomic Energy Commission and the Commission from holding hearings for the issuance of a construction permit and to revoke the previous construction exemption granted by the Commission. They further sought a declaration that the exchange of lands violated a treaty with Mexico known as the "Convention Between the United States of America and Mexico for the Protection of Migratory Birds and Game Mammals" and a declaration that 16 U.S.C. Sec. 668dd, under which statute the exchange was made, was unconstitutional.
 
 
 2
 Motions to dismiss were filed by the Secretary and the two utility companies and were submitted to District Judge Green. In a memorandum opinion and order, Judge Green held that plaintiffs had standing to sue but granted the motions to dismiss on the grounds of sovereign immunity and that agency action, committed by law to agency discretion, was not reviewable by the courts.
 
 
 3
 Plaintiffs then filed an amended complaint which was a radical departure from their original complaint. The amended complaint contained only one cause of action whereas the original complaint had set forth four. This amended complaint sought only to declare that the transfer of title from the United States to the two public utilities "was and is an arbitrary and capricious act and constitutes an abuse of discretion. Plaintiffs pray that this Court implement said declaration by issuing an order directing defendants Toledo Edison and C.E.I. to return title to the Navarre Marsh to the United States."[1] It is significant that plaintiffs did not ask that the United States be ordered to return to the utilities the title to the land which the Government received from them in the exchange. This omission, obviously, was not an oversight on the part of the plaintiffs but a clear recognition on their part of the salutary rule that no court has jurisdiction to divest title of the United States to sovereign property. Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), rehearing denied, 338 U.S. 840, 70 S.Ct. 31, 94 L.Ed. 514 (1949). The position of the plaintiffs, if adopted by the Court, would leave the two utilities in a very precarious position, losing the land which they acquired by exchange and also the Darby Marsh which they conveyed to the Government. Plaintiffs, however, in their brief suggest that the utilities may not be entirely without any remedy as they might sue the United States in the Court of Claims for damages for confiscating their property. This is a hollow remedy as the utilities should be entitled to the return of their property as a matter of right if the exchange is rescinded.
 
 
 4
 The Secretary and the utilities filed a motion to dismiss the amended complaint which was submitted to District Judge William K. Thomas under the individual calendar system. Judge Thomas considered the matter and in a Memorandum Opinion and Order granted the motions to dismiss on the same grounds as were relied on by District Judge Green. The plaintiffs have appealed. The defendants cross-appealed raising the issue of standing. We affirm.
 
 
 5
 * The Exchange of Lands
 
 
 6
 The two utilities which serve northern Ohio with electric power are co-developers of the Davis-Besse Nuclear Power Station. Initially, and prior to 1968, they had secured an option on and later acquired the legal title to a 480-acre tract of land in Ottawa County, Ohio, abutting on Lake Erie, and known as Darby Marsh. The United States owned a tract of land in the same county bordering on the lake and consisting of about 455 acres of marshland and 77 acres in a corner most of which was upland. It was known as the Navarre Marsh and is located farther away from Port Clinton, Ohio, than Darby Marsh.
 
 
 7
 The United States, acting through its Department of Interior, Fish and Wildlife Service, Bureau of Sport Fisheries and Wildlife, entered into a written agreement with the utilities to exchange the Navarre Marsh for the Darby Marsh. As part of the consideration, the utilities agreed to lease back to the United States, rent free for fifty years, about 455 acres (except strips for water canals) and another similar lease for twenty-five years of adjacent lands for a wildlife refuge subject to certain reserved rights. The utilities further agreed to spend up to $175,000 to rebuild 3200 feet of dikes on the Darby Marsh; maintain dikes on the north and south sides of the Navarre Marsh, and install three electric pumps on the Navarre Marsh to maintain proper water levels. The exchange was completed on October 3, 1968, when the utilities conveyed the Darby Marsh to the United States and the Government conveyed Navarre Marsh to the utilities. Upon completion of the exchange, the United States had a wildlife refuge of twice the number of acres it originally had (less the strips for canals and reserved rights) and, in addition, the improvements and benefits above related.
 
 II
 The Authority of the Secretary of Interior
 
 8
 In making the exchange, the Secretary acted under the authority of 16 U.S.C. Sec. 668dd(b)(3)[2] which provides as follows:
 
 
 9
 "(b) In administering the System, the Secretary is authorized-
 
 
 10
 ******
 
 
 11
 * * *
 
 
 12
 (3) to acquire lands or interests therein by exchange (a) for acquired lands or public lands under his jurisdiction which he finds suitable for disposition, or (b) for the right to remove, in accordance with such terms and conditions as the Secretary may prescribe, products from the acquired or public lands within the System. The values of the properties so exchanged either shall be approximately equal, or if they are not approximately equal the values shall be equalized by the payment of cash to the grantor or to the Secretary as the circumstances require."
 
 
 13
 It will be noted, as plaintiffs agree, that the statute confers broad discretion on the Secretary in the exchange of lands. No conditions relating to the environment were imposed in the statute. This is made clear by Sec. 668dd(a) which provides:
 
 
 14
 "(a) . . . No acquired lands which are or become a part of the System may be transferred or otherwise disposed of under any provision of law (except by exchange pursuant to subsection (b)(3) of this section) unless (1) the Secretary of the Interior determines after consultation with the Migratory Bird Conservation Commission that such lands are no longer needed for the purposes for which the System was established, and (2) such lands are transferred or otherwise disposed of for an amount not less than (A) the acquisition costs of such lands, in the case of lands of the System which were purchased by the United States with funds from the migratory bird conservation fund, or (B) the fair market value of such lands (as determined by the Secretary of the date of the transfer or disposal), in the case of lands of the System which were donated to the System. The Secretary shall pay into the migratory bird conservation fund the aggregate amount of the proceeds of any transfer or disposal referred to in the preceding sentence." (Italics added)
 
 
 15
 Plaintiffs contend that the Secretary violated 16 U.S.C. Secs. 701, 715a, 715i, 742a(3), 742b(c).
 
 
 16
 Sections 715 and 715i apply only to lands for purchase or rent under Secs. 715-715d, 715e, 715f-715k and 715l-715r.
 
 
 17
 The remaining sections, namely, 16 U.S.C. Secs. 701, 742a(3) and 742b set forth the goals of the Department of Interior under the Migratory Game and Insectivorous Bird Chapter of Title 16. They contain no limitation on the Secretaries' authority in the exchange of lands.
 
 
 18
 The Administrative Procedure Act (APA) 5 U.S.C. Sec. 701 et seq., relied on by plaintiffs, expressly excepts its application to the extent that "agency action is committed to agency discretion by law" 5 U.S.C. Sec. 701(a)(2). Since, as we have pointed out, the Secretary had discretion to determine whether he should enter into the agreement for the exchange of the lands, his action in so doing is not reviewable by the courts. Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958); United States v. Walker, 409 F.2d 477 (9th Cir. 1969); Knight Newspapers, Inc. v. United States, 395 F.2d 353 (6th Cir. 1968); Ferry v. Udall, 336 F.2d 706 (9th Cir. 1964), cert. denied, 381 U.S. 904, 85 S.Ct. 1449, 14 L.Ed.2d 286 (1965.)
 
 III
 Sovereign Immunity
 
 19
 The Supreme Court made it clear that in a case of this type the crucial question "is whether the relief sought in a suit nominally addressed to the officer is relief against the sovereign." Larson v. Domestic & Foreign Commerce Corp., supra.
 
 
 20
 This is very easy to determine in the present case where the plaintiffs are attacking the validity of a completed exchange of lands between the sovereign and private persons. Their claim that, since filing their amended complaint, they are not now asking for any relief against United States property is transparent. District Judge Thomas in his Memorandum properly characterized it as follows:
 
 
 21
 "Thus plaintiffs seek to circumvent Judge Green's conclusion, in dismissing the original complaint, that
 
 
 22
 The relief sought is a declaration that the land exchange is void and must be set aside as a nullity. The effect of such a decree would be to restore title to the lands involved to where they stood prior to the exchange.
 
 Plaintiffs argue that
 
 23
 Whatever claim the utilities might have as the result of the granting of the relief which plaintiffs have requested, could certainly be protected either by a cross-claim or a later action in the Court of Claims.
 
 
 24
 Manifestly, if the doctrine of sovereign immunity denies the jurisdiction of this court to declare the exchange agreement a nullity then this court also lacks jurisdiction to entertain a cross claim by the utilities seeking restoration of Darby Marsh from the Government, a disposition of 'unquestionably sovereign property,' Larson, supra at 619 n. 11 [69 S.Ct. at 1462].
 
 
 25
 Invoking the equitable powers of this court plaintiffs ask for an order 'directing defendants Toledo Edison and CEI to return title of Navarre Marsh to the United States.' This court would not grant this request for equitable relief without simultaneously ordering the Government to return Darby Marsh to the utilities.
 
 
 26
 A decree in equity 'should completely determine the controversy before the court,' Stonega Coke & Coal Co. v. Price, 116 F.2d 618, 621 (4th Cir. 1940). Partial or incomplete decrees should not be entered, 27 Am.Jur.2d Equity Sec. 108 (1966). In more graphic language, 'equity delights to do justice, and that not by halves,' 30 C.J.S. Equity Sec. 104 (1965). Thus the equitable relief now sought, as before, involves 'the disposition of unquestionably sovereign property' and is barred by the doctrine of sovereign immunity as set forth in Larson, supra at 691 n. 11 [69 S.Ct. at 1462]."
 
 
 27
 Certainly if the United States were seeking to rescind the exchange of lands (which it is not) a court of equity, in granting such relief, would restore the parties to status quo. The Court would not require the filing of a cross-claim or a suit for damages in the Court of Claims in order to do equity and justice to the parties. The Government has not appropriated or confiscated property of the utilities and they would have no basis for filing either a cross-claim in this action or a damage suit in the Court of Claims. Here both the United States and the utilities are adhering to their contract. Since the United States could not rescind the exchange without restoring the utilities to status quo, it hardly seems necessary to point out that a stranger to the transaction stands in no better position.
 
 
 28
 We assume that plaintiffs made the Secretary of the Interior a party defendant to this action for a definite purpose, namely, to bind him as well as the United States by any decree of the Court.
 
 
 29
 The plaintiffs are asking the Court to declare "that the transfer of title to Navarre Marsh was and is an arbitrary and capricious act and constitutes an abuse of discretion. Plaintiffs further pray that this Court implement said declaration by issuing an order directing defendants Toledo Edison and CEI to return title of Navarre Marsh to the United States."
 
 
 30
 As District Judge Thomas so aptly pointed out, the Court would not issue such an order without restoring title to Darby Marsh in the utilities. Stevens v. McCoy, 60 Ohio St. 540, 54 N.E. 517 (1899); 21 O.Jur.2d, Exchange of Property, Sec. 8; 30 Am.Jur.2nd, Exchange of Property Sec. 41.
 
 
 31
 Equitable principles apply to the Government as well as to private individuals except when limited by statutory provisions. United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 26 S.Ct. 282, 50 L.Ed. 499 (1906); Jacobs v. United States, 239 F.2d 459 (4th Cir. 1956), cert. denied, 353 U.S. 904, 77 S.Ct. 666, 1 L.Ed.2d 666 (1957).
 
 
 32
 In Larson v. Domestic & Foreign Commerce Corp., supra, the Court said:
 
 
 33
 "The request for an adjudication of the validity of the sale was thus, even in form, a request for an adjudication against the sovereign. Such a declaration of the rights of the respondent vis-a-vis the United States would clearly have been beyond the court's jurisdiction." Id. p. 689 fn. 9, 69 S.Ct. p. 1461.
 
 
 34
 It was argued that the action of the Secretary is invalid because it was based on an incorrect decision as to both law and fact. This argument was effectively answered in Larson, where the Court said:
 
 
 35
 "It is argued that an officer given the power to make decisions is only given the power to make correct decisions. If his decisions are not correct, then his action based on those decisions is beyond his authority and not the action of the sovereign. There is no warrant for such a contention in cases in which the decision made by the officer does not relate to the terms of his statutory authority. Certainly the jurisdiction of a court to decide a case does not disappear if its decision on the merits is wrong. And we have heretofore rejected the argument that official action is invalid if based on an incorrect decision as to law or fact, if the officer making the decision was empowered to do so. Adams v. Nagle, 1938, 303 U.S. 532, 542, 58 S.Ct. 687, 692, 82 L.Ed. 999. We therefore reject the contention here. We hold that if the actions of an officer do not conflict with the terms of his valid statutory authority, then they are the actions of the sovereign, whether or not they are tortious under general law, if they would be regarded as the actions of a private principal under the normal rules of agency. A Government officer is not thereby necessarily immunized from liability, if his action is such that a liability would be imposed by the general law of torts. But the action itself cannot be enjoined or directed, since it is also the action of the sovereign." (Italics ours)
 
 
 36
 The Court further stated (at page 704, 69 S.Ct. at page 1468):
 
 
 37
 "As was early recognized, 'the interference of the Courts with the performance of the ordinary duties of the executive departments of the government, would be productive of nothing but mischief. . . ."'
 
 
 38
 Other cases following and applying the rule in Larson v. Domestic & Foreign Commerce Corp., supra, are: Hawaii v. Gordon, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963); Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1956); Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962); See also Adams v. Nagle, 303 U.S. 532, 542, 58 S.Ct. 687, 82 L.Ed. 999 (1938).
 
 
 39
 In Ogletree v. McNamara, 449 F.2d 93 (6th Cir. 1971), in referring to sovereign immunity, we said:
 
 
 40
 "Perhaps the minimum statement of that doctrine is that litigation must not be allowed to stop government in its tracks. Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 704, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). In this regard the effect of the action upon the sovereign rather than its form is controlling. The fact that the defendants are all named as individuals does not change the result." (Citing authority.)
 
 
 41
 One thing is certain and that is that if a third person is allowed to litigate the validity of exchanges of land made by the Secretary of Interior, whenever he believes that the Secretary acted improperly, there will be no more exchanges and the action of Congress providing for them will be frustrated.
 
 
 42
 In Sergeant v. Fudge, 238 F.2d 916 (6th Cir. 1956), we held that a litigant could not enjoin a decision by the Postmaster General to discontinue a post office. Similarly, in Manhattan-Bronx Postal Union v. Gronouski, 121 U.S.App.D.C. 321, 350 F.2d 451, 455 (1965), cert. den. 382 U.S. 978, 86 S.Ct. 548, 15 L.Ed.2d 469, the Postmaster General's refusal to recognize the Postal Union was held not to be reviewable by the courts notwithstanding the claim that the decision was "unlawful, arbitrary and capricious" and "'in violation of' Executive Order No. 10988."
 
 The Court said:
 
 43
 "The short of appellants' case is that appellee has misconstrued the President's instructions, and the law is clear that an officer of the United States does not act outside his authority whenever he acts upon an erroneous decision of law or fact, if he is empowered to make the decision. See Larson v. Domestic and Foreign Commerce Corp., supra, 337 U.S. at 695, 703, 69 S.Ct. 1457; Arizona ex rel. Arizona State Bd. of Public Welfare v. Hobby, 94 U.S.App.D.C. 170, 221 F.2d 498 (1954); Seiden v. Larson, supra, 88 U.S.App.D.C. at 263, 188 F.2d at 666."
 
 
 44
 There is no question but that the Secretary of Interior was empowered by Sec. 668dd(b)(3) to make the exchange. Furthermore, it should be pointed out that "the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property." Larson v. Domestic & Foreign Commerce Corp., supra, fn. 11 at 691 of 337 U.S., at 1462 of 69 S.Ct.
 
 
 45
 Here the United States and the two utilities have owned, possessed and used for more than two years the lands which they respectively acquired by deeds of conveyance in the exchange. The District Court has no jurisdiction to undo and unravel the transaction.
 
 
 46
 The Administrative Procedure Act does not waive sovereign immunity in an action involving the Secretary of Interior. Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe, 370 F.2d 529, 532 (8th Cir. 1967). See also: State of Washington v. Udall, 417 F.2d 1310, 1320 (9th Cir. 1969); Motah v. United States, 402 F.2d 1 (10th Cir. 1968); Cotter Corp. v. Seaborg, 370 F.2d 686 (10th Cir. 1966); Chournos v. United States, 335 F.2d 918 (10th Cir. 1964); Cyrus v. United States, 226 F.2d 416 (1st Cir. 1955); Coalition for United Community Action v. Romney, 316 F.Supp. 742 (N.D.Ill.1970).
 
 IV
 Standing
 
 47
 We have difficulty in following the argument that plaintiff's members were using and enjoying the marsh which is a wildlife refuge or sanctuary for migratory birds, or that the exchange of lands would interfere with the right of plaintiff's members to fish in Lake Erie. The marsh is not like a park which the public is invited to use.
 
 
 48
 Plaintiff's action was to set aside an exchange of lands. It was not an action to enjoin the construction or operation of an atomic energy plant.
 
 
 49
 Since we have disposed of this case on its merits, it is not necessary for us to decide the issue of standing.
 
 V
 The Dissent
 The dissent states:
 
 50
 "Can a nuclear power plant and a wildlife refuge exist side by side in the same marsh? That is the issue in this case." Respectfully disagreeing, that is not the issue in this case. As before stated, the plaintiff's action was not to enjoin the construction or operation of a nuclear power plant but rather to set aside an exchange of lands completed two years prior to the institution of this action and without restoring the parties to the status quo. We have shown that sovereign property cannot be taken from the government by the courts. The dissent undertakes to do this very thing contrary to the position taken by the plaintiffs on this issue. The Secretary of Interior had fully authority to make the exchange and even if he erred in fact or in law the courts have no jurisdiction to interfere.
 
 
 51
 Affirmed.
 
 
 52
 McCREE, Circuit Judge (concurring).
 
 
 53
 I agree that the doctrine of sovereign immunity bars plaintiffs' action against the Secretary. See Hawaii v. Gordon, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963); Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962); Larson v. Domestic & Foreign Commerce Corporation, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); see generally Cramton, Nonstatutory Review of Federal Administrative Action: The Need for Statutory Reform of Sovereign Immunity, Subject Matter Jurisdiction, and Parties Defendant, 68 Mich.L.Rev. 387 (1970); Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv.L.Rev. 1 (1963). And since this action cannot be maintained against the Secretary, an independent basis for suing the utility companies must appear in the amended complaint, and my examination of the pleadings discloses none. The complaint, construed most favorably to the plaintiffs, does not contend that in the land exchange the nongovernmental defendants injured rights possessed by the plaintiffs. In these circumstances, I believe that the complaint was properly dismissed. It should be emphasized that this dismissal intimates no view on any subsequent action that might be brought by plaintiffs against the utilities to determine the rights and duties of the parties respecting the utilization of Navarre Marsh.
 
 
 54
 FEIKENS, District Judge (dissenting).
 
 
 55
 There are competing interests in our country between the need to preserve our environment and the demand for new sources of power and energy. It is not easy to find a proper balance between these needs, but it is a task that must be begun or the results of indecision-a destroyed environment-will preclude any balance at all. Can a nuclear power plant and a wildlife refuge exist side by side in the same marsh? That is the issue in this case.
 
 
 56
 In the past decade, Congress has evidenced a clear mandate that this task of balancing must be commenced.
 
 
 57
 The Sierra Club and the Citizens for Clean Air and Water commenced this suit to seek a determination whether the Secretary of the Interior made such a studied balance in giving up a part of land in the National Wildlife Refuge System so that a nuclear power plant could be erected there.
 
 
 58
 In an affidavit which was filed in the District Court, Secretary of the Interior Stewart Udall, who was in office at the time of the exchange, testified:
 
 
 59
 "1. During the exchange negotiations and formal exchange of Navarre Marsh for Darby Marsh in 1967-1968, I was the duly appointed Secretary of the Department of the Interior for the government of the United States.
 
 
 60
 "2. At and during the period of time during which the aforesaid land exchange was under consideration by the Department's Bureau of Sports Fisheries and Wildlife, I received only a superficial explanation of the proposed land exchange. Due to this fact, the ecological consequences, of this transaction were not brought to my attention.
 
 
 61
 "3. On the 15th day of February, 1971, the sworn affidavits of Drs. Skoch, Trautman, and Meeks, as well as those of Messrs. Van Camp, Lau, and Trenchard, were submitted to me. I have familiarized myself with the facts related therein.
 
 
 62
 "4. Had the facts stated in the aforementioned affidavits been brought to my attention during the Department's decision-making process, I most probably would have refused to approve the exchange.
 
 
 63
 "5. Having read the aforesaid affidavits and having familiarized myself generally with the proposed Navarre Marsh construction plans of the electric utility companies, e. g., the expected excavation and laying of a submerged outflow pipe for the Davis-Besse Plant, I join in the conclusion of the natural scientists that irreparable damage will most probably be caused to a known, valuable wildlife refuge area by further construction within its confines."
 
 
 64
 The Navarre Marsh, the subject matter of this litigation, was acquired by the Government on May 15, 1967. In October, five months later, the Secretary entered into an agreement to transfer this land as a part of an exchange for another marsh. Presumably at the time of its acquisition the Secretary followed statutory requirements and determined before purchase that this marsh was necessary for the conservation of migratory birds and other wildlife, 16 U.S.C. Sec. 715(a), and yet five months later, this land was bargained away. Plaintiffs have asked that this transfer be set aside unless it can be shown that the Secretary either followed the statute under which he was proceeding by making a determination that the wildlife refuge was no longer necessary for conservation purposes or by making a determination that the exchange and the resultant use of the marsh would not be harmful to the wildlife refuge system.
 
 
 65
 Of preliminary concern is the question of standing.
 
 
 66
 Standing, as recently stated by the Supreme Court in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), requires a preliminary showing of individual injury. This has been satisfied here. Plaintiffs have alleged in their complaint:
 
 
 67
 "In addition, the Sierra Club and the Citizens for Clean Air & Water represent a class composed of their individual members who reside in the Northern Ohio area and who have regularly used and enjoyed the Navarre Marsh to observe and study the wildlife which inhabit the Navarre Marsh and the migratory birds which frequent the Navarre Marsh as a stopover point on their northerly and southerly migrations, and other members of the Sierra Club and Citizens for Clean Air & Water who regularly fish in the area of Lake Erie adjacent to the Navarre Marsh. Plaintiffs further state that the illegal and improper exchange of Navarre Marsh for other lands, has caused and will cause severe damage to the individual conservation and aesthetic interests of their members as more particularly set forth hereinafter."
 
 Furthermore, it is clear that:
 
 68
 ". . . once review is properly invoked, that person may argue the public interest in support of his claim that the agency has failed to comply with its statutory mandate." Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).
 
 
 69
 So, since plaintiffs have shown requisite standing in making their cause of action, they may properly assert the public interest in framing their claims.
 
 
 70
 The complaint alleges that the Secretary failed to consider the intent and purposes of the various acts under which he is required to act and that his conduct was accordingly ultra vires.
 
 
 71
 16 U.S.C. Sec. 701 requires the Secretary to preserve and protect game and other wild birds.
 
 
 72
 "The duties and powers of the Department of the Interior include the preservation, distribution, introduction and restoration of game birds and other wild birds."
 
 
 73
 16 U.S.C. Sec. 715i directs him to protect migratory birds in accordance with treaties with Canada and Mexico, and to protect other wildlife and to develop adequate wildlife habitats.
 
 
 74
 "Sec. 715i. Administration-Treaty obligations; rules and regulations
 
 
 75
 "(a) Areas of lands . . . or interests therein acquired or reserved pursuant to sections 715-715d, 715e, 715f-715k, and 715n-715r of this title shall, unless otherwise provided by law, be administered by the Secretary of the Interior under rules and regulations prescribed by him to conserve and protect migratory birds in accordance with treaty obligations with Mexico and Canada, and other species of wildlife found thereon, including species that are threatened with extinction, and to restore or develop adequate wildlife habitat."
 
 
 76
 16 U.S.C. Sec. 742a(3) requires him to protect fish and other wildlife resources.
 
 
 77
 16 U.S.C. Sec. 668aa et seq., the Endangered Species of Fish and Wildlife Act, is the act under which this exchange was made (16 U.S.C. Sec. 668dd(i)). Here Congress has stated:
 
 
 78
 ". . . The purposes of this Act are to provide a program for the conservation, protection, restoration, and propagation of selected species of native fish and wildlife, including migratory birds, that are threatened with extinction." 16 U.S.C. Sec. 668aa.
 
 
 79
 These sections illustrate strong congressional intent to preserve our environment and the natural habitat of birds and other wild animals. In this respect, it would be well to keep in mind the congressional admonition found in the National Environmental Policy Act (42 U.S.C. Sec. 4331) that:
 
 
 80
 ". . . it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. Sec. 4331(a).[1] (Emphasis added.)
 
 
 81
 The section under which the Secretary acted states:
 
 
 82
 "(b) In administering the System, the Secretary is authorized-
 
 
 
 * * *
 (3) to acquire lands or interests therein by exchange (a) for acquired lands or public lands . . . which he finds suitable for disposition. . ." 16 U.S.C. Sec. 668dd(b)(3).
 This language is part of the Endangered Species of Fish and Wildlife Act added in 1966.
 Defendants contend that this section gives the Secretary total discretion to dispose of any land, regardless of the harmful effect such transfer would have on the system he is required to administer. This contention is unacceptable. The intent of Congress is clear. It has stated, ". . . The purposes of this Act are to provide a program for the conservation, protection, restoration, and propagation of selected species of native fish and wildlife, including migratory birds, that are threatened with extinction." 16 U.S.C. Sec. 668aa.
 "(b) It is further declared to be the policy of Congress that the Secretary of the Interior, the Secretary of Agriculture, and the Secretary of Defense, together with the heads of bureaus, agencies, and services within their departments, shall seek to protect species of native fish and wildlife, including migratory birds, that are threatened with extinction, and, insofar as is practicable and consistent with the primary purposes of such bureaus, agencies, and services, shall preserve the habitats of such threatened species on lands under their jurisdiction." 16 U.S.C. Sec. 668aa(b).
 This direction of Congress requires the Secretary to protect endangered species and to consider the effect that an exchange of land would have on such species.
 It is contended that these purpose clauses impose no legal duty upon the Secretary. There are, however, some limits on the Secretary's action; otherwise, the statute would be infirm as an unconstitutional delegation of authority. If there are no standards by which it is possible to determine "whether the will of Congress has been obeyed," the delegation is too vague.
 As the Supreme Court stated in Stark v. Wickard, 321 U.S. 288, 309-310, 64 S.Ct. 559, 571, 88 L.Ed. 733 (1944):
 "When Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted. This permits the courts to participate in law enforcement entrusted to administrative bodies only to the extent necessary to protect justiciable individual rights against administrative action fairly beyond the granted powers. The responsibility of determining the limits of statutory grants of authority in such instances is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction."
 Section 668dd(b)(3) which exempts exchanges from certain statutory requirements is cited. Even though the exchange exemption has been broadened and applies only to the stated statutory objective (for example, he is obligated to consult with the Migratory Bird Conservation Commission), the exchange power is still subject to review under the general purpose clause of the statutes cited.
 Since the administrative regulations do not detail the purposes for which exchanges may be made, the court must turn to the only guidelines available-the general purposes for which the various environmental statutes were enacted.
 An agency may not exercise uncontrollable discretion-to hold otherwise would be to depart from those principles of government to which we have long adhered.
 Since the Secretary may have chosen to act without regard to statutory standards, this court should require a trial to determine if the action was lawful. To hold the cause unreviewable does not resolve the question of administrative discretion. It is precisely the function of the trial to determine if the Secretary did act within the powers granted him.
 If the Secretary had chosen the wiser course and had held hearings and made findings, indicating the purposes and reasons for arriving at the decision that a nuclear power plant in the Navarre Marsh is not incompatible with the National Wildlife Refuge System, this court would not have to perform the task which the government now so strenuously opposes. It is this inquiry that must be made.
 Plaintiffs allege that the Secretary acted without regard to the effect his action would have on birds and other endangered species which habitate Navarre Marsh. If this is so, the exchange must be set aside.
 Defendants argue that even though the Secretary may have abused his discretion, his action is unreviewable even for abuse because it is "action committed to agency discretion." The Administrative Procedure Act (5 U.S.C. Sec. 701) states that judicial review of agency action may be made except where "agency action is committed to agency discretion by law."
 The Supreme Court has stated in Abbott Laboratories v. Gardner, 387 U.S. 136, 140-141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), that ". . . judicial review . . . will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress" and that the Administrative Procedure Act "embodies the basic presumption of judicial review . . . so long as no statute precludes such relief or the action is not one committed by law to agency discretion, . . ." and that the Act's "generous review provisions must be given a 'hospitable' interpretation."
 Of prime importance is legislative intent. After careful study of the legislative history of these provisions, I can find no intent to preclude review. Although there is indication that the Secretary has wide discretion, there is no hint that the discretion is boundless, or not subject to review for abuse.
 An analysis of cases involving agency actions that have been held unreviewable illustrates a pattern. The courts have held that cases which involve political questions, United States v. Sisson, 396 U.S. 812, 90 S.Ct. 92, 24 L.Ed.2d 65 (1969), questions concerning military matters, Curran v. Laird, 136 U.S.App. D.C. 280, 420 F.2d 122 (1969), or matters involving administrative expertise, Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958), see also Kletschka v. Driver, 411 F.2d 436 (2nd Cir. 1969), are not reviewable.
 Where, however, as here, the question is appropriate for court review because it involves matters suitable for judicial resolution, courts have not hesitated to review. As stated in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971):
 ". . . the Secretary's decision here does not fall within the exception for action 'committed to agency discretion.' This is a very narrow exception. Berger, Administrative Arbitrariness and Judicial Review, 65 Col. L.Rev. 55 (1965). The legislative history of the Administrative Procedure Act indicates that it is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply."' S.Rep.No.752, 79th Cong., 1st Sess., 26 (1945).
 Here it is clear that there is law to apply. The question for trial is whether there are sufficient findings to support the conclusion that the Navarre Marsh can contain a nuclear power plant and still protect migratory birds-that the Navarre Marsh containing a nuclear power plant does not endanger birds or animals threatened with extinction. See 16 U.S.C. Sec. 668aa et seq.
 The majority contend that regardless of any breach of duty by the Secretary, this action must be dismissed because of sovereign immunity, relying upon Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). This contention is not sound.
 Larson involves a case where plaintiffs alleged that the Government breached its contract with the plaintiff. The Supreme Court held that the action was barred by sovereign immunity. The Court held that the sales agent had the power to construe the contract:
 "There is no allegation of any statutory limitation on his powers as a sales agent. In the absence of such a limitation he, like any other sales agent, had the power . . . to refuse delivery in cases in which he believed that the contract terms had not been complied with. His action in so doing in this case was, therefore, within his authority even if, for purposes of decision here, we assume that his construction was wrong and that title to the coal had, in fact, passed to the respondent under the contract." 337 U.S. at 703, 69 S.Ct. at 1468.
 The principle enunciated in Larson only applies where an agent has authority to act but acts wrongfully under general contract or tort theory. It does not apply where the cause of action, as here, is based upon the Secretary's alleged failure to follow the statute:
 ". . . [W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are ultra vires his authority and therefore may be made the object of specific relief." 337 U.S. at 689, 69 S.Ct. at 1461.
 This teaching applies squarely to the case before us. Plaintiffs' cause of action rests on the language of the statute. It imposes a duty on the Secretary to consider environmental effects, and the effect on the wildlife system as a whole before he transfers land out of the system. If he has not done so his action is ultra vires.
 The land exchange is prohibited if inconsistent with a "program for the conservation, protection, restoration, and propagation of selected species of native fish and wildlife, including migratory birds, that are threatened with extinction." (16 U.S.C. Sec. 668aa), or if it does not "seek to protect species of native fish and wildlife, including migratory birds, that are threatened with extinction". (16 U.S.C. Sec. 668aa(b)). These are the statutory standards.
 The majority contend that to allow this suit would stop the Government in its tracks. Perhaps, on a trial, that would be the result here. The courts have never hesitated to halt governmental action when it is illegal. The only party stopped, in fact, is not the Government, but the utilities, until it is determined by a trial that there is a balance between the congressional purpose of protecting our wildlife and our environment with our need for power. It is possible that a nuclear power plant can exist in the Navarre Marsh and not harm the environment or threaten wildlife. This must be ascertained, and if such is not possible, the Secretary acted without authority. Sovereign immunity cannot be used as a shield to prevent inquiry. If so, we will most certainly lose the fight to conserve and preserve our environment. The Executive Department of government cannot hide behind such an immunity. The utilities, too, should be interested in the inquiry involved in a trial. The American people yearn for solutions that would provide both additional power and a preserved environment. The utilities can make a great and continuing contribution by pointing the way.
 If, as a result of a determination at trial that the exchange was made without a proper determination of the ecological effects, the transfer must be set aside. This would include return of the consideration for the exchange, the Darby Marsh, which was transferred to the Government. Defendants argue that this would violate the principles of sovereign immunity. This is not so. If as here the action is not barred by sovereign immunity, the form of remedy does not make it so. Once it is determined that the Government acted illegally, a court of equity has full power to restore the parties to the status quo ante. As stated in Knox Hill Tenant Council v. Washington, 145 U.S.App.D.C. 122, 448 F.2d 1045, 1052-1053 (1971),
 "To the extent that sovereign immunity survives as an assurance that courts, rather than the Congress, will not dictate the disposition or utilization of property which belongs to all the people and which, with good reason in democratic theory, has been immemorially thought to reside under the legislative will, we find no threshold jurisdictional bar in the record before us. There is nothing new about judicial entertainment of suits which charge that federal officials are acting outside of, or in conflict with, the responsibilities laid upon them by the Congress or the Constitution. Whether such charges are true, and, if so, what remedial action the court should or may direct, are questions partaking of the merits, and not of jurisdiction to explore the merits.
 "If, after trial, it be found that appellees do in fact have a responsibility for the property in their care which they are not recognizing adequately, the court's power, at the least, to declare that responsibility and to define that default is not dissipated solely by the circumstances that legal title to the property is in the United States. To hold otherwise would be to say that sovereign immunity forecloses any judicial inquiry whatsoever into the custodianship by a federal official of federal property. There is no magic about real estate, or its ownership by the United States, which hedges its guardians about with an immunity not available to other executants of public policies committed to their care by the Congress."
 To the same effect, Bob Jones University v. Connally, 341 F.Supp. 277, 284 (D.S.C.1971):
 "It has long been recognized that the sovereign cannot act illegally or unconstitutionally and, therefore, if an act or threatened action is unconstitutional or illegal it is not the action of the sovereign and such acts or threatened acts can be enjoined."
 The same principles apply here.
 For my brother Judge McCree, sovereign immunity stands as a bar. I respectfully disagree. In his 1970 Supplement to Administrative Law Treatise, Professor Davis says (Section 27.00-4, p. 905):
 "Sovereign immunity often produces an uncivilized result, because what counts-what determines who gets the property, for instance-is not reason but force, not law but power, not orderly adjudication but physical taking by the stronger party, not refinements the sum of which we call civilization but crudities that are sometimes characteristic of primitive men."
 Professor Davis continues at page 906:
 "A thoughtful district judge recently said that sovereign immunity 'rests either on the theory that the United States is the institutional descendant of the Crown and enjoys its immunity or on a metaphysical doctrine that there can be no legal right as against the authority that makes the law.'[30] "
 Accordingly, I would reverse the dismissal (granted on motion) and require the cause to proceed to trial. Plaintiffs, as a matter of law, have the burden of proof, but the vital requirement-the inquiry, in court, to determine whether here there is a balance between competing interests-is essential.
 
 
 *
 The Honorable John Feikens, Judge, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The amended complaint abandoned Plaintiffs' claim against the Director of the Atomic Energy Commission and the Commission, and also abandoned plaintiffs' claims of treaty violation and the alleged unconstitutionality of 16 U.S.C. Sec. 668dd
 
 
 [2]
 This is the statute which plaintiffs originally claimed was unconstitutional but later abandoned that claim
 
 
 [1]
 I do not intimate that a retroactive application of the E.P.A. is the cornerstone of plaintiffs' complaint although some courts have applied this act to existing projects insofar as is practicable; e. g., Environmental Defense Fund v. TVA, 339 F.Supp. 806 (E.D.Tenn.1972). Rather, I feel that this act, among others, indicates the attitude and spirit of congressional legislation relative to the environment
 
 
 [30]
 Martyniuk v. Pennsylvania, 282 F.Supp. 252, 255 (E.D.Pa.1968)