Rev. Donald L. JACKSON,
Plaintiff-Appellant,

v.

The STATLER FOUNDATION et al.,
Defendants-Appellees.

No. 46, Docket 73–1543.

United States Court of Appeals,
Second Circuit.

Argued Oct. 24, 1973.

Decided Dec. 4, 1973.

Revised April 5, 1974.

Rev. Donald L. Jackson, appellant pro se.

Thomas P. Flaherty, Buffalo, N.Y. (William B. Mahoney and Peter J. Crotty, Buffalo, N.Y., of counsel), for appellee The Statler Foundation.

Robert M. Hitchcock, Buffalo, N.Y. (Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y. Heino H. Prahl, Buffalo, N.Y. of counsel), for appellees James H. Cummings Foundation, Inc., Farny R. and Grace K. Wurlitzer Foundation, Inc. and The Buffalo Foundation.

Albert R. Mugel, Buffalo, N.Y. (Jaeckle, Fleischmann & Mugel, Buffalo, N. Y., David M. Brown, Buffalo, N.Y., of counsel), for appellee Julia R. and Estelle L. Foundation, Inc.

Robert J. Kresse, Buffalo, N.Y., (Hellings, Morey, Kresse & Rickers, Buffalo, N.Y.), for appellee Margaret L. Wendt Foundation.

Michael J. Hutter, Buffalo, N.Y. (Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N.Y., James M. Wadsworth, of counsel), for appellee The Cameron Baird Foundation.

Falk, Siemer, Glick, Tuppen & Maloney, Buffalo, N.Y., on the brief for William J. Connors Foundation.

Brown, Kelly, Turner, Hassett & Leach, Buffalo, N.Y., on the brief for Harry Dent Family Foundation, Inc.

Williams, Stevens & McCarville, Buffalo, N.Y., on the brief for Josephine Goodyear Foundation.

Before SMITH, MANSFIELD and OAKES, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is an appeal from an order of the United States District Court, Western District of New York, John T. Curtin, Judge, dated March 7, 1973, dismissing appellant's complaint on the pleadings. We reverse in part, affirm in part and remand for further proceedings.

Appellant Reverend Jackson brought suit against thirteen charitable foundations located in the Buffalo, New York area alleging racial discrimination against himself, his children and his foundation in that the appellee foundations refused to hire him as a director of their foundations, refused to give scholarships to his children and refused to grant money to his foundation, all for reasons of race. Appellant also challenged an alleged pattern of discriminatory employment and investment by the foundations. Reverend Jackson sought injunctive and declaratory relief, damages, the revocation of appellees' tax exempt status under the Internal Revenue Code, and an order directing the foundations to surrender all their assets to the United States Treasury. Judge Curtin dismissed the complaint, ruling that insofar as appellant's claims were based on 42 U.S.C. § 1983, Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), precluded a finding of "state action" and thus required dismissal, that to the extent that the claims were based on 42 U.S.C. §§ 1981 and 1985 there were insufficient facts stated in the complaint, and that Reverend Jackson had no standing to challenge appellees' tax exemptions.

■■ Throughout these proceedings, Reverend Jackson has appeared *pro se*. This fact no doubt explains much of the confusion in his complaint and in his briefs. That confusion is compounded by appellant's shotgun approach to this litigation, an approach which casts some doubt on the substantiality of his

claims.[1]   Still, courts must construe *pro se* complaints generously, Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed. 2d 652 (1972), and it is for the district court and not for us to judge factual issues.

## I.

Although a liberal reading of appellant's complaint evidences a sufficient basis to give him standing to challenge appellees' tax exemptions, *see* McGlotten v. Connally, 338 F.Supp. 448, 452 (D.D.C.1972) (three-judge court), and Falkenstein v. Department of Revenue, 350 F.Supp. 887, 888 (D.Or.1972) (three-judge court), appeal dismissed, Oregon State Elks Ass'n v. Falkenstein, 409 U.S. 1099, 93 S.Ct. 907, 34 L.Ed.2d 681 (1973), the complaint, insofar as it seeks revocation of the appellees' federal and state tax exempt status, is deficient on its face for failure to join the Secretary of the Treasury and the New York State Tax Commissioner, who would be indispensable parties to a suit for such relief.[2]   Moreover, appellant has not alleged facts which would give him standing to challenge past employment and investment patterns, failing to show how he personally has been affected by these practices.[3]   Neither has he displayed an explicit intention to sue in a representative capacity.   Since appellant is appearing *pro se*, we leave these matters for the district court to deal with on remand, without prejudice to motions to join necessary parties and to amend the complaint to allege additional facts. Further, the district court should consider requesting that counsel represent appellant.   In this regard, we note that if appellant's foundation is incorporated it may only appear with counsel.   Shapiro, Bernstein & Co. v. Continental Record Co., 386 F.2d 426 (2d Cir. 1967).

This court has jurisdiction to consider appellant's challenge to appellees' tax exemptions.[4]   *See McGlotten, supra*, 338 F.Supp. at 452–453.

## II.

Appellant's § 1983 claim against the foundations as well as the tax exemption challenges require us to wade "into the murky waters of the 'state action' doctrine."

The court below dismissed appellant's § 1983 claim on the authority of *Moose*

---

1. Appellee Cummings Foundation alleges that this lawsuit arose out of some ten to fifteen mimeographed and/or printed form letters sent to some 14,900 foundations, nationwide, over a period of three years.   Appellant apparently requested of each of these 14,900 foundations that it name him to its board of directors, give scholarships to his children and give grants to his foundation.   Appellant did not contest this description of the genesis of the lawsuit.

2. Joinder of the Secretary of the Treasury and the New York State Tax Commissioner may well obviate the jurisdictional challenge based upon lack of governmental or state action.   *See*, Green v. Connally, 330 F.Supp. 1150 (D.D.C.) (three-judge court), aff'd sub nom. Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971) ; Green v. Kennedy, 309 F.Supp. 1127 (D.D.C.1970) (three-judge court).

3. Appellant has not alleged, for example, that he is a resident of the Buffalo area, although the resume which he sent to the foundations and which is contained in his appendix suggests that he does reside there.

4. True to form, appellant nowhere specifies what exemptions he is challenging.   The appellee foundations have been understandably reluctant to fill this vacuum and identify the various exemptions they enjoy.   Federal assistance is embodied by 26 U.S.C. § 501(c)(3), which exempts these organizations from income taxation and §§ 170(c)(2), 642(c), 2055, 2106(a) and 2522, which make individual contributions to such organizations deductible for income, estate and gift tax purposes.   Among the important state tax provisions are § 249–c of the New York State Tax Law, McKinney's Consol.Laws, c. 60, which exempts bequests to foundations from the estate tax, §§ 208 and 615 of the Tax Law, which "piggy-back" the federal income and corporate tax deduction provisions, and § 1230, which exempts these organizations from local taxation.   The State's definition of exempt organizations substantially tracks the federal definition: "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals.   . . . "   26 U.S.C. § 501(c)(3).

*Lodge, supra.* That decision involved a suit by a guest of a member of the lodge who was refused service because he was black. He brought suit under § 1983 against both the lodge and the Pennsylvania Liquor Authority, which had granted a liquor license to the lodge. The Supreme Court held that the grant of the license did not constitute "state action," distinguishing Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), where "state action" had been found on the grounds that the discriminating Eagle Restaurant constituted part of the Parking Authority project. The *Moose Lodge* Court emphasized that Pennsylvania did not benefit from the lodge as Delaware had benefited from the restaurant (in terms of the enhanced viability of the Parking Authority), that the lodge was located on private property whereas the restaurant had been on public land, and that the lodge was a "private club" whereas the restaurant had been open to the general public, save black people.

Whether private conduct which is in some manner aided by the actions of the State is or is not "state action" for the purposes of the Fourteenth Amendment is not an easy question.[5] "Only by sifting facts and weighing circumstances can the non-obvious involvement of the State in private conduct be attributed its true significance. Burton . . . at 722, 81 S.Ct. 856." *Moose Lodge, supra,* 407 U.S. at 172, 92 S.Ct. at 1971. This appears to be the first case in which the issue of the status of tax-exempt "private foundations"[6] has been raised.

5. Since appellant challenges the actions of both New York State and of the Federal Government, it might be more accurate to refer to the challenged activity as "governmental action" rather than as "state action." *See, e. g.,* Wahba v. New York University, 492 F.2d 96 (2d Cir. 1974). Nonetheless, as the *McGlotten* Court pointed out:

> . . . the determination of when state involvement is sufficient either to bring otherwise private discrimination within the aegis of the Fifth or Fourteenth Amendment, or to evoke a duty on the part of the government to prevent that discrimination, has traditionally been styled one of "state action." Little clarity is gained at this stage by attaching a different label to the same inquiry depending on who is the defendant.

338 F.Supp. 448, 455, n. 31.

6. There is a dispute in the literature as to the proper definition of a "private foundation." Mr. Merrimon Cuninggim, head of the Danforth Foundation, states:

> Foundations . . . are often modified by the adjective "private," but it is something of a misnomer and one ought to be chary about using the word. Their funds are not private, for the money no longer belongs to the original donor, whoever he is. Rather, it is public money, set aside to be so by an uncommon act of stewardship on the part of the donor. Correspondingly, the activities of foundations are not private, for a catalogue of them must be reported to the government as the representative of the people, and anyone is privileged to have a look. Their field of operation is not limited to the so-called private sector, for grants of many foundations have traditionally been made to a wide variety of governmental units and programs, large and small.

> The only sense in which "private" applies is that the decisions of foundations are not in the hands of the general public or of Government. This is, of course, an immensely important distinction; and the trouble is, we simply do not have a suitable word to describe the peculiar mixture of public and private that characterizes a foundation—a combination of public interest and public service with private judgment. It is for this reason that in the simplified definition above, the modifier is "non-governmental." To say it in that way may be more illuminating than simply to call foundations unmodifiedly "private." A fuller definition might run to such a complicated, jawbreaking sentence as the following: Foundations are non-governmental agencies, privately established and managed, but in which the public has a stake and which are answerable to Government, possessing financial resources, usually in the form of endowment, and existing to serve the general welfare or some chosen segment of it, usually in the form of grants.

M. Cuninggim, Private Money and Public Service (N.Y.1972), 4–5. Mr. Alan Pifer, President of the Carnegie Corporation, disagrees in part:

> The foundation is, paradoxically, both private and public in its nature. It is private because it is incorporated as a pri-

Prior case law while not directly controlling is not, of course, unenlightening. It is noteworthy that several courts have considered claims that the activities of tax-exempt organizations constitute "state action." Significantly, these cases divide into two groups: Where racial discrimination is involved, the courts have found "state action" to exist; where other constitutional claims are at issue (due process, freedom of speech), the courts have generally concluded that no "state action" has occurred. *Compare, McGlotten, supra;* [7] Pitts v. De-

vate, non-governmental institution, derives its assets from private donors, and is privately controlled by a donor-appointed or self-perpetuating board of trustees.

There is a common misunderstanding that the public character of the foundation, and hence the public stake in it, derives from its tax-exempt status. How frequently has one heard it said that foundations are really spending public money, and therefore should be subject to greater governmental control. Such a view, however, is based on fallacious reasoning and reveals either surprising ignorance or a dangerous disavowal of one of the basic tenets of the American system.

Throughout our history we have believed in pluralism and have practiced it. We have recognized that the nation's public purposes are considerably more extensive in scope than its governmental purposes, and, through the aegis of the state, we have enabled a wide variety of private institutions, including foundations, to be chartered to accomplish certain *public,* though non-governmental, purposes. We have also, through the aegis of the state, given tax exemption to these institutions to facilitate their work and have regarded this as being eminently in the public interest. Therefore, to attribute the public stake in the foundation to its tax-exempt status or to regard this status as a "privilege" is wholly erroneous. It is, in Professor Milton Katz's pithy phrase, "to mistake an effect for a cause."

The true origin of the public aspect of the foundation lies in the nature of its activity. It is public because it devotes its funds to purposes in which the total society has a vital interest, such as *education,* health, and welfare. Grants in these fields do without question affect the public, and hence the public has a legitimate stake in the foundations which make them.

But there is an even more important sense in which the foundation is public in character. It is public because the public cannot afford to regard with indifference how foundation funds are spent, so precious are they, as we have seen, in the vital process of social change, and so limited are they in amount. The $1.3 billion spent by foundations in 1967 was, for example, less than 0.2 per cent of the Gross

National Product, less than 9 per cent of total voluntary giving, and only 3 per cent of the federal government's expenditure for health, education, and welfare.

Foundation funds, in short, offer a case where a technically private asset is of such potential value to the nation that it must, perforce, be regarded as a public asset. The implications of this proposition are far reaching. . . .

Report of the President of the Carnegie Corporation, 1968, in Reeves ed., Foundations Under Fire (Ithaca, 1970) 54–55. Professor Jeffrey Hart speaks of foundations as "shadow governments." Foundations and Social Activism: A Critical View, in The American Assembly, Columbia University ed., The Future of Foundations (Prentice-Hall, 1973) 43, 47. Professor John Simon disagrees and presents a cogent defense of the unique role of these organizations. Foundations and Public Controversy: An Affirmative View, in The Future of Foundations, 58, 79–100.

What the commentators are unsure of, the nature of the beast and the consequences which flow therefrom, is very much related to the question before us: Are "private foundations" private or public bodies? But at least there appears to be agreement on the fact that the defendants are all "private foundations" in the sense of the Tax Reform Act of 1969, Pub.L. 91–172, which in effect defines a "private foundation" as a charitable organization that receives its contributions from relatively few sources and spends its funds through grants and operating programs. 26 U.S.C. § 509.

7. Although one issue in that case was the constitutionality of provisions of the Internal Revenue Code (§§ 170(c)(4), 642(c), 2055, 2106(a) and 2522) to the extent that they authorized tax exemptions for nonprofit organizations which excluded nonwhites from membership, the court there stated:

Plaintiff's claim thus leads us into the murky waters of the "state action" doctrine, for we must determine whether by granting tax benefits to private organizations which discriminate on the basis of race in membership, the Federal Government has supported or encouraged private discrimination so as to have itself violated

partment of Revenue, 333 F.Supp. 662 (E.D.Wis.1971) (three-judge court); Falkenstein, *supra*; Smith v. YMCA of Montgomery, 316 F.Supp. 899 (M.D. Ala.1970), modified, 462 F.2d 634 (5th Cir. 1972), *with* Powe v. Miles, 407 F.2d 73 (2d Cir. 1968); Browns v. Mitchell, 409 F.2d 593 (10th Cir. 1969); Chicago Joint Board, Amalgamated Clothing Workers v. Chicago Tribune Co., 435 F. 2d 470 (7th Cir. 1970), cert. denied, 402 U.S. 973, 91 S.Ct. 1662, 29 L.Ed.2d 138 (1971); Bright v. Isenbarger, 314 F. Supp. 1382 (N.D.Ind.1970), aff'd 445 F. 2d 412 (7th Cir. 1971) and Marker v. Schultz, 485 F.2d 1003 (D.C.Cir.1973). *See also*, Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). This dichotomy is explained in part by the double "state action" standard which has been recognized—one, a less onerous test for cases involving racial discrimination, and a more rigorous standard for other claims. *See, e.g.*, Lefcourt v. Legal Aid Society, 445 F.2d 1150, 1155 n. 6 (2d Cir. 1971); Wolin v. Port Authority, 392 F.2d 83, 89 (2d Cir. 1968), cert. denied, 393 U.S. 940, 89 S. Ct. 290, 21 L.Ed.2d 275 (1969); *Powe*, *supra*, 407 F.2d at 81–82; *Pitts*, *supra*, 333 F.Supp. at 668–669. However, these results may also be explainable in terms of facts and circumstances peculiar to each case.

■ A review of the "state action" case law suggests five factors which are particularly important to a determination of "state action": (1) the degree to which the "private" organization is de-

pendent on governmental aid; (2) the extent and intrusiveness of the governmental regulatory scheme; (3) whether that scheme connotes government approval of the activity or whether the assistance is merely provided to all without such connotation; (4) the extent to which the organization serves a public function or acts as a surrogate for the State; (5) whether the organization has legitimate claims to recognition as a "private" organization in associational or other constitutional terms.

Each of these factors is material; no one factor is conclusive.

While the record before us with regard to the particular defendant foundations is meager, it does appear that private tax-exempt foundations in many instances may well involve "state action."

The defendant foundations no doubt receive substantial assistance in the form of tax exemptions. Green v. Kennedy, 309 F.Supp. 1127, 1134 (D.D.C. 1970) (three-judge court); Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723, 730–733 (1973); *Marker, supra*, 485 F.2d at 1006, n. 4; *McGlotten, supra*, 338 F.Supp. at 456, n. 37 and 459, n. 58; Bob Jones University v. Connally, 341 F.Supp. 277, 281 (D.S.C. 1971), rev'd on other grounds, 472 F.2d 903, 906 (4th Cir. 1973), cert. granted, 414 U.S. 817, 94 S.Ct. 116, 38 L.Ed.2d 49 (1973). It is highly unlikely that they could sustain their programs at anywhere near present levels without the exemptions.[8] It might well be that, ab-

---

plaintiff's right to the equal protection of the laws. McGlotten v. Connally, 338 F. Supp. at 455.

8. The motivation behind philanthropic activity of this type is complex. Mr. John T. Jones, President of the Houston Endowment, has stated: "I think we can all agree that foundations are originally created and endowed by men of more than normal wealth who wish to pass on this wealth for the public benefit. . . . Whether this wish is motivated by pure virtue, a slightly-tarnished desire to see a name perpetuated beyond the grave, or nothing more than sheer animal hatred for the Federal Government is

not of concern to us." Quoted in Goulden, The Money Givers (New York, 1971), 20. However, the empirical research which exists suggests the wisdom of Judge Friendly's remark that the fruits of philanthropy "are often better than its roots." Quoted in Green v. Connally, 330 F.Supp. at 1162, from Friendly, The Dartmouth College Case and the Public-Private Penumbra, 12 Texas L.Q. (2d Supp.) 141, 171 (1969). Thus in 1969 the Peterson Commission on Foundations and Private Philanthropy asked eighty-five people whose median individual annual giving the last five years had been $375,000 what effect the eradication of the

sent these exemptions, these foundations would never have been established.

It appears also that these foundations are subject to a "sustained and detailed administrative relationship . . . for enforcement of statutory . . . standards. . . ." *Walz, supra,* 397 U.S. at 675, 90 S.Ct. at 1414.

The 1969 Tax Reform Act requires every tax-exempt foundation to file an annual information return with the Internal Revenue Service.[9] The annual report must be made available for public inspection for a period of 180 days after newspaper notice of its availability.[10] The Internal Revenue Service has assured Congress that it is closely scrutinizing the activities of "private foundations."[11] The 1969 Tax Reform Act imposed an excise tax on the net in-

---

deduction provision would have on their donations. The median reduction predicted was 75%. Prepared Statement of Peter G. Peterson, Chairman, Peterson Commission on Foundations and Private Philanthropy, Senate Hearings, Tax Reform Act of 1969, Part 6, pp. 6119, 6137. To the extent that these responses were self-serving, they underestimate the reduction which would occur.

9. The information return must include:
(a) gross income; (b) expenses attributable to such income; (c) disbursements for the purpose for which it is exempt; (d) a balance sheet showing its assets, liabilities and net worth as of the beginning of each year; (e) the total of the contributions and gifts received during the year and the names and addresses of all substantial contributors; (f) the names and addresses of its managers and highly compensated employees; and (g) the compensation paid to each individual in (f) above.
26 U.S.C. § 6033.
Private foundations with assets over $5000 must file an annual report which must include the following:
(a) gross income for the year; (b) expenses attributable to income and incurred within the year; (c) all disbursements within the year, including administrative expenses; (d) a balance sheet showing its assets, liabilities and net worth as of the beginning of the year; (e) an itemized statement of its securities and all other assets at the close of the year, showing both book and market values; (f) the total of the contributions and gifts received during the year; (g) an itemized list of all grants and contributions made or approved for future payment during the year. This list must show the amount of each grant, the name and address of the recipient, any relationship between the individual recipient and the foundation's managers or between the individual recipient and the foundation's managers or substantial contributors, and a concise statement of the purpose of each grant or contribution; (h) the address of the principal office of the foundation and of the place where its books and records are maintained; (i) the names and addresses of its managers; and (j) a list of persons described in (h) above who are substantial contributors or who own 10 percent or more of any organization of which the foundation owns 10 percent or more.
26 U.S.C. § 6056.

10. 26 U.S.C. § 6104.

11. This assurance is embodied by an Internal Revenue Service memorandum entitled, "Internal Revenue Commitments to Congress on Exempt Organizations." It reads in full:
Early in 1969, former Commissioner Thrower, in his discussions with representatives of Congress, made some promises in connection with revitalizing the Service's Exempt Organization Examination Program. These promises are now generally referred to as the Service commitments for the Exempt Organization Program. They include the following:
1. A separate Exempt Organization Branch would be established in the Audit Division of the National Office. That Branch would have the responsibility for planning, coordinating, and closely directing the Exempt Organization Program.
2. The Service would centralize exempt organization determination letter and examination work into 16 key districts strategically located throughout the country.
3. The National Office Audit Division would develop a National Office Controlled Case List. This list would include the largest and most complex exempt organizations (primarily foundations) and these organizations would be examined on a two-year cycle.
4. Substantial increases would be made in staffing of Exempt Organization Examiners in the key districts. Specific mention was made that most of the Exempt Organization Examination Program would be devoted to audits of private foundations.
5. The Service would undertake to examine all private foundations on a five-year cycle.
The foregoing encompasses the major commitments that the Service has undertaken in

vestment income of private exempt foundations, the revenue to finance the surveillance mechanisms contemplated by the Act.[12] The Tax Reform Act also mandated certain changes in the charters of exempt foundations. Foundation charters must now include provisions which expressly require adherence to the substantive limitations on foundation activity provided for in the Act.[13]

its revitalized Exempt Organization Examination Program. We have fulfilled the promises made on establishing a separate Exempt Organization Branch, centralizing the field Exempt Organization in to 16 key districts and expanded the man years devoted to exempt organization examinations to approximately 220 during the past three fiscal years. We expect to complete our commitment to examine all foundations within five years by December 31, 1974. This would be right on target with the promise made by former Commissioner Thrower. The National Office Controlled Case Program has been operating as promised since 1970. Accordingly, we feel that the Service is living up to its commitments to Congress in the area of exempt organizations. *See also*, CCH Private Foundations Reporter, ¶ 6502.

12. 26 U.S.C. § 4940. The rationale of the tax was described in the House Report as follows:

[I]t is clear that vigorous and extensive administration is needed in order to provide appropriate assurances that private foundations will promptly and properly use their funds for charitable purposes. This tax, then, may be viewed as being in part a user fee.
[H.R.Rep.No.91–413, 91st Cong., 1st Sess. 19, U.S.Code Cong. & Admin.News, p. 1663 (1969)]

The report of the Senate Finance Committee spoke of this tax as "a supervisory fee and as an indication of the amount of funds needed by the Internal Revenue Service for proper administration of the Internal Revenue Code provisions relating to private foundations and other exempt organizations. . . ." S.Rep.No.91–552, 91st Cong., 1st Sess. 27, U.S.Code Cong. & Admin.News, p. 2054 (1969).

13. These substantive portions of the Tax Reform Act amount to the following:

Foundations are prohibited from engaging in direct or indirect financial transactions (so-called self-dealing) with donors or other related parties, whether the transactions benefit the foundation or not.

The assets of a foundation may not be invested in risky or speculative ventures that jeopardize its charitable purposes.

The use of foundations to control closely held or family businesses is restricted through a provision limiting the permissible combined stock holdings of a foundation and related parties to 20 percent. Elaborate phase-out provisions are prescribed for existing excess business holdings owned by foundations.

Foundations are required to spend an amount for charitable purposes each year equal to their current income, excluding capital gains. If a foundation's income is less than a prescribed rate of return on its investment assets, it is required to pay out this minimum investment return (initially set by the statute at 6 percent, with a phase-in period for preexisting foundations).

Foundations are prohibited from making expenditures to attempt to influence the outcome of a specific election. Grants for voter registration are permitted only in limited circumstances intended. to insure nonpartisanship.

Foundations are forbidden to make any payments to elected or appointed government officials except for reimbursement of domestic travel expenses.

Individuals who receive foundation grants for travel, study, or similar purposes must be selected in accordance with objective and non-discriminatory procedures approved in advance by the Internal Revenue Service.

Foundations must exercise "expenditure responsibility" over grants to other organizations that are themselves private foundations or do not qualify for tax exemption as charities. Expenditure responsibility requires the foundation to make reasonable efforts and establish adequate procedures to see that the funds are expended by the grantee for the prescribed purpose, to obtain complete financial reports from the grantee, and to submit detailed reports to the IRS.

Foundations are prohibited from making expenditures to attempt to influence legislation either by seeking to affect public opinion or by communicating with government officials who may participate in the formulation of legislation. Exceptions are provided for "making available the results of nonpartisan analysis, study, or research"; providing "technical advice or assistance" to a governmental body or committee in response to its written request; expressing opinions on legislation affecting the foundation's own tax or legal status.

Foundations are prohibited from making expenditures for noncharitable purposes.
Labovitz, 1969 Tax Reforms Reconsidered, in The Future of Foundations, 101–02.

The most relevant of the substantive limitations is 26 U.S.C. § 4945(a)–(d) and (g).[14] These sections provide that a foundation which gives grants to individuals must do so in an "objective and non-discriminatory" manner. If it does not do so, the foundation and the manager who approved that grant are respectively subject to an "excise tax" of 10% and 2½% of the offending grant. If the offending grant is not recovered to the extent that recovery is possible by the foundation within a certain time, the fines are increased to 100% and 50%. These provisions would appear to apply to Reverend Jackson's complaint of discrimination in the failure to award scholarships to his children. These provisions would also appear to oppose the notion that "state action" is present.

However, these appearances may be deceiving. The abuse which Congress sought to curb by means of these provisions was the practice of making grants to the well-connected few, not a practice of failure to make grants to candidates selected out for suspect reasons. Professor Bittker puts the statute in historical context:

> Section 4945's restrictions on "individual grants" by private foundations are also best viewed, if one wants to be realistic, as a bit of legislation whose general form belies its specific origin. If the Ford Foundation had not made its famous grants to members of Senator Kennedy's staff when they left their federal jobs after his assassination, it is not likely that the Senate Finance Committee would have concluded that
>
>> existing law does not effectively limit the extent to which foundations can use their money for "educational" grants to enable people to take their vacations abroad, to have paid interludes between jobs, and to subsidize the preparation of materials furthering specific political viewponts.

Bittker, Should Foundations Be Third-Class Charities?, in The Future of Foundations, pp. 132, 157–58.

The House Report stated:

> The bill also prohibits nonobjective grants to individuals. This provision does not affect private foundations which engage in extensive programs involving grants to individuals chosen as a result of open competitions or on any other nondiscriminatory programmatic basis. Also, certain foundations have developed an expertise in grant-making that is utilized by other private foundations. These developments in the private foundation field are in accord with the concern of your committee that expertise and fairness replace whim and personal relationships in such matters.

To enforce these restrictions, Congress enacted a series of "excise taxes" designed to serve as penalties for violation.

The procedural and substantive provisions noted are the highlights of the federal regulatory framework. See generally, CCH Private Foundations Reporter. As to regulation by New York State, see ¶ 900 of the CCH Reporter. The very existence of this two volume reporter testifies to the "detailed and sustained administrative relationship" between "private foundations" and the government.

14. The significant subsection is 26 U.S.C. § 4945(g):

(g) Individual grants.—Subsection (d)(3) shall not apply to an individual grant awarded on an objective and nondiscriminatory basis pursuant to a procedure approved in advance by the Secretary or his delegate, if it is demonstrated to the satisfaction of the Secretary or his delegate that—

(1) the grant constitutes a scholarship or fellowship grant which is subject to the provisions of section 117(a) and is to be used for study at an educational institution described in section 151(e)(4).

(2) the grant constitutes a prize or award which is subject to the provisions of section 74(b), if the recipient of such prize or award is selected from the general public, or

(3) the purpose of the grant is to achieve a specific objective, produce a report or other similar product, or improve or enhance a literary, artistic, musical, scientific, teaching, or other similar capacity, skill, or talent of the grantee.

H.R.Rep.No.91–413, 91st Cong., 1st Sess. 34, U.S.Code Cong. & Admin.News, p. 1679 (1969).

The remedy provided tracks this reading of Congressional intent: Since the evil was awarding grants for invalid reasons, the remedy is the revocation of the grant. If the evil were a failure to award a grant for invalid reasons, revocation would make little sense as a remedy. *In accord,* Treas.Reg. § 53.4945–4(b)(5).

Congress attempted in § 4945 to prevent nepotism and favoritism in grantmaking, examples of the use of foundation assets for private purposes. There is no evidence to the effect that Congress sought to prevent foundations from choosing on the basis of race between two public uses of foundation assets.[15] Properly construed, these provisions are only further evidence of the instrusiveness of the regulatory scheme.

Such an intrusive and detailed scheme was deemed necessary to prevent the use of foundations' assets for a wide range of private purposes, such as profit-taking, control of businesses, and nepotism, and to ensure that the fruits of exemption benefit the public. As the Report of the House Committee on Ways and Means, H.R.Rep.No.91–413, 91st Cong., 1st Sess. 39, U.S.Code Cong. & Admin. News, p. 1684 (1969) stated:

> . . . your committee has determined that organizations should not receive substantial and continuing tax benefits in exchange for the promise of their contributions to society, and then avoid the carrying out of these responsibilities.

*Accord,* Senate Finance Committee, S.Rep.No.91–552, 91st Cong., 1st Sess. 55, U.S.Code Cong. & Admin.News, p. 2027 (1969). As one commentator concludes, the " . . . Act's basic approach is to locate and maintain contact with the foundations. . . ." Private Foundations under the Tax Reform Act of 1969, 7 Colum.J.Law & Soc. Prob. 240, 254 (1971).

The exemptions in question are not the type of government assistance such as police or fire protection, which is routinely provided to all without any connotation of approval. *See Moose Lodge, supra,* 407 U.S. at 173, 92 S.Ct. 1965. Organizations must apply for exempt status.[16] Moreover, the acts of application and approval are not value neutral. In effect, the government would appear to be certifying that every foundation on its tax-exempt list is laboring in the public interest. *Compare, Marker, supra,* 485 F.2d at 1007, *with McGlotten, supra,* 338 F.Supp. at 456–457.

It also appears that the defendant foundations cannot assert a constitutional claim to be left alone. *Compare,* Gilmore v. City of Montgomery, 473 F.2d 832, 838–839 (5th Cir. 1973), cert. granted, 414 U.S. 907, 94 S.Ct. 215, 38 L.Ed.2d 145 (1973) and Bob Jones University, 341 F.Supp. at 285, with Green v. Connally, *supra,* n. 2, 330 F.Supp. at 1165–1168. While these organizations may not hold themselves out to the public as open to all but a few as did the Eagle Restaurant, they surely are not private clubs which value the intimate relationships among their members as did the Moose Lodge. To the extent that any constitutional rights are in-

15. It does appear that part of the impetus behind the Tax Reform Act of 1969 was an attempt to curb the efforts of some foundations to aid the cause of racial minorities. *See, e. g.,* Neilsen, The Big Foundations, 18–19, 332–61. This impetus is reflected in some parts of the Act, such as the provisions which limit the use of foundation assets for political purposes. 26 U.S.C. § 4945(d)(1) and (e). But it seems clear that Section 4945(a)–(d) and (g) does not

represent the Congressional resolution of the "problem" of reverse discrimination.

16. See, "Application for Recognition of Exemption," Form 1023, Form 872–C, and Instructions 1023, Department of the Treasury, Internal Revenue Service. Among the questions asked in the application is: "What benefits, services, or products will the organization provide with respect to its exempt function?" Part III, 8(a), of Form 1023.

volved here, it is more likely the right to dispose of one's property as one chooses. Yet it is well settled that one cannot dispose of property in a racially discriminatory manner and entangle the State in the process. Evans v. Newton, 382 U.S. 296, 301, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Commonwealth of Pennsylvania v. Brown, 392 F.2d 120 (3d Cir.), cert. denied, 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657 (1968).

As to public function, there may be more question. The legislative history concerning the purpose of the Internal Revenue Code's charitable exemption and deduction sets forth this rationale:

> The [deduction] is based upon the theory that the Government is compensated for the loss of revenue by its relief from financial burden which would otherwise have to be met by appropriations from public funds, and by the benefits resulting from the promotion of the general welfare.

H.R.Rep.No.1860, 75th Cong., 3d Sess. 19 (1938). This might be said to raise something approaching a presumption that foundation activities are public functions. However, this may not be the case with respect to the particular foundations which are defendants in this case.[17] The record before us is unclear on this point.

■ In sum, we believe that if on remand the district court finds that the defendant foundations are substantially dependent upon their exempt status, that the regulatory scheme is both detailed and intrusive, that that scheme carries connotations of government approval, that the foundations do not have a substantial claim of constitutional protection, and that they serve some public function, then a finding of "state action" would be appropriate. Moreover, even if one of these factors is absent, a finding of "state action" may still be appropriate. On remand, the parties may be able to point to individual circumstances which distinguish the defendants from exempt private foundations generally. Again, the anticipated joining of the Commissioner of Internal Revenue and the State Tax Commissioner should illuminate the issues.[18]

■ At least as to the appellee Buffalo Foundation, however, the record is somewhat fuller and the balance must be struck somewhat differently. The Buffalo Foundation admitted in an affidavit in support of a motion for summary judgment that its by-laws provide that of its seven-member Governing Committee one member is to be appointed by the Mayor of Buffalo, one by the Surrogate of Erie County, one by the United

17. Exempt foundation activity runs the gamut from the giant, multifaceted Ford Foundation, through the many mid-sized foundations devoted exclusively to such areas of endeavor as medicine or education, to such organizations as travel groups, dinner clubs, dog clubs and hobby clubs. *See generally*, "Activity Code Numbers of Exempt Organizations," Form 1023, p. 6. However, the "bulk of the financial assistance that United States foundations provide" goes to education, medicine and hospital care, the performing arts and basic research. Goldberg, and Oates, The Costs of Foundation-Supported Activities, Foundation News, July/August, 1973, pp. 35, 38. These latter activities are examples of public functions.

The Peterson Commission determined that foundation and government activity now largely overlap. Indeed, the Commission concluded that the relatively recent expansion of government activity required a refor-

mation of the rationale for the foundation tax exemption—away from the notion that foundations do things that government is not doing or should not be doing and toward the idea that foundations should do certain things because they do those things better than government does them. This new rationale views foundations as more efficient than government in that foundations can be more flexible and more innovative than government. Peterson, *supra*, n. 5, at 6152–55. If it is the case that the defendant foundations engage in activity which is not undertaken by government only because of bureaucratic or majoritarian constraints on governmental action, then this activity should perhaps be considered as a "public function."

18. It is possible, however, that this issue will be mooted by a failure to survive summary judgment.

States District Court Judge of the Western District of New York, and one by the Senior Justice of the Supreme Court Trial Term in the Buffalo district. This type of governmental participation in the management of an organization comes perilously close to the situation in Pennsylvania v. Board of Trusts, 353 U. S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957), where the position of an agency of the State as trustee of an organization was held sufficient without more to constitute "state action." Of course, here the control is less absolute and direct. But even indirect governmental participation in the management of an organization is persuasive evidence of the existence of "state action" where that participation is both substantial and other than neutral. This is not to say that the Surrogate Court's traditional supervisory role transforms the estate or trust into "state action." *See,* United States National Bank v. Snodgrass, 202 Or. 530, 275 P.2d 860 (en banc 1954); Gordon v. Gordon, 332 Mass. 197, 124 N.E.2d 228, cert. denied, 349 U.S. 947, 75 S.Ct. 875, 99 L.Ed. 1273 (1955); Mayers v. Ridley, 151 U.S.App.D.C. 45, 465 F.2d 630, 658–659 (1972) (en banc, Tamm, J., dissenting). But here public officials, named in their *ex officio* capacities, control the selection of a majority of the governing body, and the Buffalo Foundation appears to have established this procedure for the very purpose of involving the public in its activities. This participation is neither insignificant nor neutral. Therefore, as to the Buffalo Foundation, a finding of "state action" may be warranted even if the court should find only some other significant evidence of "state action."

█ The formulation of this definition of "state action" is applicable only to claims of racial discrimination. As noted above, conduct which is admittedly part private and part governmental must be more strictly scrutinized when claims of racial discrimination are made. Again, we think that the combination of factors noted gives courts sufficient room ". . . so that a cluster of rooms in a college dormitory can be distinguished from a restaurant in a public facility, a bowling league from a bar association, and a radio repair shop from a TV broadcasting network." Bittker and Kaufman, Taxes and Civil Rights: "Constitutionalizing" the Internal Revenue Code, 82 Yale L.J. 51, 87 (1972). We doubt that the fruits of charity will wither on the vine as a result of a decision barring racial discrimination. Tax-exempt philanthropy which constitutes "state action" is limited thereby only to the extent of ensuring an absence of such discrimination. Truly private philanthropy, meanwhile, is not affected at all.

### III.

█ Appellant challenges both federal and state exemptions. Since the two exemptions are clearly linked in practice (in terms of the near identity of the statutory definitions of exemption and in terms of administrative symbiosis) and in purpose and since the evil against which the Fifth and the Fourteenth Amendments were set was governmental fostering of racial discrimination and not merely state or merely federal action, similar treatment for constitutional purposes seems proper.

█ Appellant's § 1983 claim against the foundations raises a slightly different problem. 42 U.S.C. § 1983 proscribes only conduct " . . . under color of any statute . . . of any State . . . " and has been construed as not applying to the actions of the federal government, District of Columbia v. Carter, 409 U.S. 418, 424–425, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973); Wheeldin v. Wheeler, 373 U.S. 647, 650, n. 2, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963), unless there is conspiracy between the state and federal officials, Kletschka v. Driver, 411 F.2d 436, 448–449 (2d Cir. 1969). Since no colorable claim of such conspiracy can be made here (and none has been made), in determining whether appellant has a claim under § 1983 the district court should look only to the state exemptions.

Again, because of the state of the record before us, we cannot judge the impact of the state exemptions alone.[19]

## IV.

■ Appellant's claims under 42 U. S.C. § 1981 and 42 U.S.C. § 1985 were dismissed because appellant alleged facts which, if believed, were still insufficient to state a cause of action under these sections. Since this is a *pro se* action further consideration of these claims is necessary. *Haines,* 404 U.S. 520–521, 92 S.Ct. 594. If on remand appellant, hopefully with the assistance of counsel, cannot show applications to specific defendants, the existence of specific vacancies and grants, the existence of conspiratorial action on the part of the defendant foundations, or other material facts, summary judgment will be appropriate.

## V.

■ The court below properly dismissed appellant's remaining claim. Reverend Jackson cannot seek a judicial decree directing that assets be forfeited to the United States Treasury. *Wolkstein v. Port of New York Authority,* 178 F.Supp. 209 (D.N.J.1959).

The case is remanded to the district court for further proceedings in accordance with this opinion.

## ON REQUEST FOR EN BANC RECONSIDERATION

A request for en banc reconsideration having been made by a judge of this Court, and a poll of the judges in regular active service having been taken, and Chief Judge Kaufman, Circuit Judges Mansfield, Oakes and Timbers having voted against en banc reconsideration, and Circuit Judges Friendly, Hays, Feinberg and Mulligan having voted in favor thereof, and an opinion by Circuit Judge Friendly dissenting from denial of en banc reconsideration, in which Circuit Judges Hays and Mulligan join, having been filed,

Upon consideration thereof, it is

Ordered that said request be and it hereby is denied.

Irving R. Kaufman,
Chief Judge.

FRIENDLY, Circuit Judge, with whom HAYS and MULLIGAN, Circuit Judges, join, dissenting from the denial of reconsideration en banc:

As stated in the panel opinion, this appears to be the first claim that, because of tax exemption, a denial of grants by private charitable foundations could constitute government action, for which an aggrieved applicant may obtain damages and declaratory or injunctive relief under the equal protection clause of the Fourteenth Amendment or its embodiment in the due process clause of the Fifth. Somewhat incredibly, the panel thought an affirmative answer to be so obvious as to deserve only a single paragraph of a per curiam opinion, slip opinion 573, 576, decided December 4, 1973. On December 12, 1973, I requested a poll of the judges in regular active service on reconsideration en banc; after several judges had voted for this, the panel requested that the vote be deferred pending preparation of a revised opinion. The new opinion, finding a variety of added reasons to reaffirm the previous conclusion, was not circulated until March 1, 1974. While it is even stronger against the defendants than the per curiam, in my view it is analytically unsound, dangerously open-ended, and at war with controlling precedent both in the Supreme Court and in this circuit. Indeed, with all deference, it seems to

---

19. *See,* Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. at 2811, 37 L.Ed.2d at 732 (1973) : A State may not grant the type of tangible financial aid here involved if that aid has a significant tendency to facilitate, reinforce, and support private discrimination. "[D]ecisions on the constitutionality of state involvement in private discrimination do not turn on whether the state aid adds up to 51 per cent or adds up to only 49 per cent of the support of the segregated institution." Poindexter v. Louisiana Financial Assistance Comm'n, 275 F. Supp. 833, 854 (1967).

me the most ill-advised decision with respect to "state action" yet rendered by any court and unless corrected will be the source of enormous damage to the great edifice of private philanthropy which has been one of this country's most distinctive and admirable features. Although the defendants on remand may somehow manage to escape from the net the panel has woven[1] or, more likely, to show that plaintiff's criticisms are unfounded, the harm done by this opinion will remain. It is therefore most regrettable that, despite the request of half its present complement of judges now in regular active service, the court should decline reconsideration en banc.

### I.

The panel's fundamental error is its loose characterization of the "state action" doctrine. In holding that the federal and state tax exemptions provided to charitable foundations render them subject to civil rights suits challenging their policy decisions in the selection of beneficiaries, the panel relies primarily on three-judge court cases that have struck down tax exemptions for institutions practicing the crudest form of racial discrimination—the exclusion of blacks from attendance in schools or membership in clubs of a public nature.[2] In these cases, however, the plaintiffs had sued federal or state officials to force revocation of tax benefits. The challenged action was clearly government action; the only question was whether that action sufficiently promoted private racial discrimination to render the decisions impermissible for a government officer, see Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973). In this case, by contrast, the plaintiff has sued the foundations themselves. While analysis of these two problems has occasionally overlapped, see McGlotten v. Connally, 338 F.Supp. 448, 455 (D.D.C.1972) (three-judge court); Bittker & Kaufman, Taxes and Civil Rights: "Constitutionalizing" the Internal Revenue Code, 82 Yale L.J. 51, 61–63 (1972), there is a clear distinction between them. A holding that an otherwise private institution has become an arm of the state is much broader and can have far more serious consequences than a determination that the state has impermissibly fostered private discrimination. The foundation might be exposed to damage claims for prior discriminatory conduct and could be required by a court to make decisions not only as to the disposition of its charitable donations but in the selection of its employees in accordance with the restrictions properly imposed on governmental agencies. Indeed, it might not be able to escape the mark of government action even by disclaiming future tax benefits; the courts might hold that years of tax benefits had rendered the foundation's status as an agent of the state irrevocable, see Bittker & Kaufman, *supra*, at 60–61.

1. Although the panel technically did not make a finding of government action as to the defendant foundations in this case, I cannot see how the district court can read the substituted opinion as leaving it any real leeway.

This dissent does not apply to the holding with respect to the defendant Buffalo Foundation, which I agree falls within the principle of the Girard College decisions, Pennsylvania v. Board of Directors of City Trusts, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1958), and Pennsylvania v. Brown, 392 F.2d 120 (3 Cir.), cert. denied, 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657 (1968).

2. Significantly, the only one of these four cases cited in the per curiam to have been approved by the Supreme Court was Green v. Connally, 330 F.Supp. 1150 (D.D.C.), aff'd mem. sub nom. Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971), which dealt with tax exemption for a lily-white Southern school and struck down the exemption on *statutory* grounds. The *Green* case is supported in its result, if not entirely in its reasoning, by Poindexter v. Louisiana Education Comm'n for Needy Children, 296 F.Supp. 686 (E.D.La.), aff'd mem., 393 U.S. 17, 89 S.Ct. 48, 21 L.Ed.2d 16 (1968), and Brown v. South Carolina Board of Education, 296 F.Supp. 199 (D.S.C.) (three-judge court), aff'd mem., 393 U.S. 222, 89 S.Ct. 449, 21 L.Ed.2d 391 (1968).

## II.

The implications of this decision for institutions receiving tax benefits of various sorts are staggering. Simply because of tax exemptions, private social agencies, community centers, institutions of higher education, homes for the young and the aged, endowed by private donors for the sole or preferential benefit of particular creeds or races, must open their doors equally to all, with every decision subject to judicial reexamination, even though this may impair or destroy the very purpose which led the donor to endow them. Beyond this, if the tax exemption given to charitable foundations converts their giving into government action, I see no really tenable basis for distinguishing the tax deductions allowed individuals and corporations.

Because of its broad availability, a tax exemption, in itself, has never previously been thought to impose the government's imprimatur sufficiently to convert the recipient into a *de facto* arm of the government. An exemption or other tax benefit, available to a wide range of institutions, has always been regarded as the least possible form of government support, except for the police and fire protection provided all citizens. The Chief Justice, writing for five Justices, said in Walz v. Tax Commission, 397 U. S. 664, 675, 90 S.Ct. 1409, 1415, 25 L. Ed.2d 697 (1970), "no one has ever suggested that tax exemption has converted libraries, art galleries, or hospitals into arms of the state or put employees 'on the public payroll.'" Still less had anyone ever suggested this, prior to the decision here, with respect to foundations, many of which are simply an incorporation of an individual's pocketbook.

There is no force in the panel's reliance on the government's regulation of foundations to *prevent* abuse of the tax exemption. The "state action" cases that have stressed the heavy presence of government regulation are those in which private institutions are carrying out state policy *against* the plaintiffs[3] or in which the state is benefiting directly from the private activity. In Powe v. Miles, 407 F.2d 73, 81 (2 Cir. 1968), we rejected the argument that New York's regulation of educational standards in private schools, colleges and universities made the disciplinary actions of Alfred College the acts of the state. That argument, we noted,

> overlooks the essential point—that the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury. Putting the point another way, the state action, not the private action, must be the subject of complaint.

The Supreme Court, in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 176–177, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), made much the same point in discussing the regulations of the Pennsylvania Liquor Control Board, which applied to the Moose Lodge. "However detailed this type of regulation may be in some particulars," the Court wrote, "it cannot be said to in any way foster or encourage racial discrimination. Nor can it be said to make the State in any realistic sense a partner or even a joint venturer in the club's enterprise." The fact that Congress has deemed it necessary in I. R.C. § 501(c)(3) to limit the tax exemption to

> any . . . foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the

3. Even in such a case the majority refused to find state action in Coleman v. Wagner College, 429 F.2d 1120 (2 Cir. 1970), without further proof that college administrators considered that a state statute required them to act *against* the plaintiffs. There could be no such finding with respect to the statutes regulating tax exemption for foundations.

activities of which is carrying on propaganda, or otherwise attempting to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office

gives no encouragement to racial discrimination. And the detailed reporting and record-keeping requirements imposed upon charitable foundations have been established to ensure that the foundations, like all taxable entities, benefit from tax advantages only when they meet the statutory qualifications.[4] The panel's attempt to blur this essential distinction between a regulatory scheme in which a private institution plays a part in an offensive government policy and one which is designed to prevent the institution's acting in an abusive way runs counter to our recent decisions in Shirley v. State National Bank of Connecticut, 493 F.2d 739 (2 Cir. 1974), and Bond v. Dentzer, 494 F.2d 302 (2 Cir. 1973). As Judge Mulligan wrote for us in the former, 493 F.2d 739, at 743, the "enactment was ameliatory not regressive; it did not 'move in' on the plaintiff or other buyers, but rather on the instalment sellers." Private action does not become state action simply because government regulation has not gone so far as a plaintiff would like.

The panel's fleeting treatment of the "public function" argument is wholly unconvincing. Private charitable foundations are light years away from the "company town" analysis of Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), and Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968). Compare Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972). Far less than the university which we held not to be an arm of the state in Powe v. Miles, *supra*, 407 F.2d at 80, do they "concern activities or facilities so clearly governmental in nature that the state cannot be permitted to escape responsibility by allowing them to be managed by a supposedly private agency."

Whereas the panel blows the factors favoring a finding of state action out of all proportion in the context here presented, it unduly minimizes a factor pointing strongly the other way. As we said in Wahba v. New York University, 492 F.2d 96, at 102 (2 Cir. 1974), courts should pay heed, in testing for government action, to the "value of preserving a private sector free from the constitutional requirements applicable to government institutions." An organization should not have to demonstrate an "associational or other constitutional" claim to privacy, as the panel suggests, before the courts will take cognizance of the social values that private eleemosynary institutions can promote. The interest in preserving an area of untrammeled choice for private philanthropy is very great. Even among philanthropic insti-

---

4. The panel attaches great weight to § 4945, added to the Code in 1969, and particularly the requirement, § 4945(d)(3), (g), that individual grants for "travel, study, or other similar purposes" be awarded "on an objective and nondiscriminatory basis." As the legislative history and the regulations make clear, this provision was intended to bar the use of private foundations as a device to channel income to previously designated individuals or to unqualified persons whose receipt of foundation grants is suspiciously inconsistent with the putative purpose for which tax exemption is granted—in other words to prevent use of a foundation for gifts that would not be deductible if made by an individual or corporation. The "objective and nondiscriminatory" requirement applies only among the members of the designated charitable class. As T.R. § 53.4945–44(b)(5) Example (2) illustrates, the statutory standard permits the charitable class to be composed of the members of a single ethnic group so long as the purpose of the program is legitimate. Indeed the panel properly concedes "There is no evidence to the effect that Congress sought to prevent foundations from choosing on the basis of race between two public uses of foundation assets." In any event this provision could not support a holding of government action with respect to foundation grants to other than individuals.

tutions, the activities of charitable family foundations, receiving no government benefit other than tax exemption, should be the last to be swept, under a "sifting of facts and exercise of judgment," within the concept of state action. There are hundreds of thousands of foundations ranging from the giants to the pigmies. While most foundations, particularly large ones, give mainly to institutions serving all races and creeds, although hardly in the completely nondiscriminatory way required of public institutions, I see nothing offensive, either constitutionally or morally, in a foundation's choosing to give preferentially or even exclusively to Jesuit seminaries, to Yeshivas, to black colleges or to the NAACP. Indeed, I find it something of a misnomer to apply the pejorative term "racial discrimination" to a *failure* to make a charitable gift. One of the most inexplicable passages in the opinion is in footnote 17, where after noting the conclusion of the Peterson Commission that the "new rationale views foundations as more efficient than government in that foundations can be more flexible and more innovative than government" because of "bureaucratic or majoritarian constraints" applicable to the latter, the opinion concludes that foundations should be subject to the same constraints applicable to government itself. Moreover, as already indicated, if the tax exemption makes this state action subject to judicial scrutiny to assure lack of discrimination, so must the tax deduction with respect to individual and corporate gifts. Donors are not going to be willing to spend their time and money, or to have directors and staffs of foundations spend theirs, in defending actions like this one. If the federal courts take over the supervision of philanthropy, there will ultimately be no philanthropy to supervise.

### III.

As said at the outset, what makes the panel's opinion so peculiarly unfortunate is that the evil will in no way be eradicated by a finding on remand that the defendants have not engaged in discrimination. Despite this, the decision will spawn countless civil rights suits against charitable foundations by disgruntled minority applicants, add unnecessarily to the crushing burden on the district courts and the courts of appeals, and, worst of all, seriously discourage private philanthropy by subjecting donors to the necessity of justifying their decisions in court. Even an impeccable history of fairness will not protect against trials in actions by those who choose to think the inevitable turndowns were based on racial grounds. The record in this case suggests that several of the defendant foundations commendably have given liberally to black and other minority causes. None have any policy against such gifts. Those that are in the business of granting scholarships have granted them to blacks. But this record will not save these foundations, and many others in later suits, from the necessity of full factual exploration and explanation of just what they have done over the years, with the attendant burdens on foundation directors and staffs and the courts.

Doubtless because of their confidence in prevailing on the merits, the defendants did not seek certiorari from the per curiam decision of last December. Since this case has been continually *sub judice* by this court and the substituted decision seems to me to go even further down the state action road, it may not be too late to do this, see F.T.C. v. Colgate-Palmolive Co., 380 U.S. 374, 384, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965). And although the Supreme Court does not generally grant certiorari with respect to non-final judgments of the courts of appeals, it does so when convinced that "there is some important and clear-cut issue of law that is fundamental to the further conduct of the case and that would otherwise qualify as a basis for certiorari," see Stern & Gressman Supreme Court Practice, § 4.19 at 180–81 (4th ed. 1969), see Land v. Dollar, 330 U.S. 731, 734 n. 2, 67 S.Ct. 1009, 91 L. Ed. 1209 (1947), and Larson v. Domes-

tic & Foreign Commerce Corp., 337 U.S. 682, 683 n. 3, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). It is to be hoped, in any event, that other circuits will not follow this disastrous course.

Judge Feinberg also dissents from the denial of reconsideration en banc.